AUTO CLUB GROUP INSURANCE COMPANY v MARZONIE

Docket No. 96828. Argued October 4, 1994 (Calendar No. 4). Decided December 29, 1994. Dissent by Levin, J., filed February 13, 1995.

Auto Club Group Insurance Company brought an action in the Genesee Circuit Court, seeking a determination whether it is liable under a homeowner's policy for personal injuries resulting from the firing of a shotgun by an insured at an occupied vehicle with the intent only to scare and cause property damage. The court, Donald R. Freeman, J., held that coverage was not precluded because the intentional acts exclusion did not apply, but did not address whether there was an occurrence under the policy. Instead, it found no actual intent to injure and no certainty of injury to the extent that an expectation to injure could be inferred as a matter of law. The Court of Appeals, Jansen, P.J., and Cavanagh and P. D. Schaefer, JJ., affirmed in an unpublished opinion per curiam, finding an occurrence and noting that the shooting was an undesigned contingency that was not anticipated or naturally expected (Docket No. 132237). The plaintiff appeals.

In opinions by Justice Riley, joined by Justices Boyle and Mallett, and by Justice Griffin, joined by Chief Justice Cavanagh and Justice Brickley, the Supreme Court reversed the judgment of the Court of Appeals.

Justice Riley, joined by Justices Boyle and Mallett, stated that coverage under the policy must be determined by construing the term "accident" from the perspective of the injured person. The question is for the trier of fact and cannot be resolved as a matter of law. However, the exclusionary language of the policy precludes coverage as a matter of law in that the insured should have expected bodily injury to have resulted from the firing of his shotgun at an occupied vehicle.

The policy at issue provides coverage for an "occurrence," defined as an accident that results in bodily injury or property damage. "Accident" is not defined. In accord with Michigan precedent, where a policy is silent with respect to perspective, the accidental nature of an event must be evaluated from the injured person's perspective. On the basis of the policy language in this case, and evaluated from the injured person's

perspective, an accident may include an unforeseen consequence of an intentional act of the insured.

Generally an event is not deemed an accident where the injured party provokes the injury, i.e., is an aggressor or otherwise is blameworthy. The facts and circumstances as a whole must be considered in applying the definition of accident: whether the injury was foreseen from the injured person's perspective. In this case, there was culpable conduct on both sides. Given the disputed facts, whether there was coverage cannot be resolved as a matter of law and is for the trier of fact.

Coverage nonetheless is precluded as a matter of law under the exclusionary language of the policy. The insured should have expected bodily injury to have resulted from the firing of his shotgun at the occupied vehicle. Any contention to the contrary flies in the face of all reason, common sense, and experience.

Justice GRIFFIN, joined by Chief Justice CAVANAGH and Justice BRICKLEY, concurring in part and dissenting in part, stated that, as a matter of law, the insured's intentional discharge of a firearm at the grill of the car was not an accident and, consequently, not an occurrence within the meaning of the policy; thus, it is unnecessary to consider the applicability of the exclusionary clause.

An occurrence is defined in the policy as an accident that results in bodily injury or property damage. While bodily injury resulted from the events in this case, whether the act or event causing the injury was an accident must be viewed from the perspective of the insured, not the claimant. Where an insured intends to cause property damage or personal injury, coverage should be denied, irrespective of whether the resulting injury is different than the injury intended. Similarly, where an insured's intentional acts create a direct risk of harm, there can be no coverage for any resulting damage or injury, despite the lack of an actual intent to damage or injure.

Reversed and remanded.

Justice LEVIN, dissenting, stated that it was for the trier of fact, and not the Supreme Court as a matter of law, to decide on the basis of the facts and circumstances of the discharge of the firearm by the insured, whether he expected or intended to cause the personal injury suffered by the victim, and thus whether what occurred was accidental and covered by the policy issued by the plaintiff.

The 1966 revision of the standard general liability policy, adopted in the policy at issue, provides coverage for an accident

that results in bodily injury neither expected nor intended. Both coverage and exclusion are to be decided from the standpoint of the insured, rather than that of the injured person. The act or conduct of the insured giving rise to liability is not in itself an, or the, occurrence. An insured's act or conduct becomes an occurrence only if it was an accident. And whether the insured's act or conduct was an accident turns on whether the consequence, the injury—not the act or conduct—was expected or intended. Unintended consequences of intentional acts are covered unless such a consequence was expected or intended from the standpoint of the insured. The focus is not on the conduct, but on whether the consequence that gave rise to liability on the part of the insured was expected or intended.

A single volitional act of an insured may give rise to consequences both expected/intended and unexpected/unintended. In such a case, because questions about intent focus on consequences, not acts, and whether conduct is an accident turns on whether the consequence is expected or intended, it necessarily follows that the single volitional act gives rise to an accident where the consequence is unexpected/unintended, and to a happening or event that is not an accident where the consequence is expected/intended. Because whether conduct is an accident turns on whether the consequence is expected or intended, when the conduct results in both expected/intended and unexpected/unintended consequences, there is no more reason to conclude that the conduct is not an accident than that it is. To conclude otherwise is to focus on the conduct rather than whether the consequence is expected or intended.

To say that the insured and the injured person are unprotected by insurance coverage for the kind of loss involved in this case because the insured intended comparatively minor damage to the victim's automobile truly elevates form over substance. Defeating coverage because comparatively minor property damage was intended is a cramped reading of "occurrence"/"accidental" inconsistent with judicial decisions preceding the 1966 revision and the drafting history and purpose of the 1966 revision.

Because (i) before the 1966 revision it was well established that coverage was provided for unintended consequences of intentional acts, and, hence, that intentional conduct was accidental where the injury was unintended, (ii) questions about intent focus on consequences, not acts, and (iii) the purpose of the 1966 revision was to provide coverage where the consequences were expected as well as where they were intended,

and not to change the focus from the consequences to the act or conduct of the insured, it is inexplicable that an injury neither expected nor intended yet is not an accident, or becomes not an accident because another comparatively minor injury was intended. The meritorious question is whether the injury suffered by the victim was expected or intended from the standpoint of the insured.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Rosalind Rochkind*), and *Gault, Davison, Bowers, Hill, Parker & McAra* (by *Edward B. Davison*) for the plaintiff.

*Edwin W. Jakeway* and *Michael J. Kelly* for defendant Marzonie.

*Edwin H. Rabin* for defendant Oaks.

RILEY, J. In this case, we must construe a homeowner's insurance policy to determine whether coverage exists or the intentional acts exclusion precludes coverage. Specifically, we must decide whether the insured's act of confronting and firing a shotgun at an occupied vehicle with the admitted intent only to scare and cause property damage, but with the actual consequence of personal injury to the driver, is covered by insurance where the policy covers acts caused by an occurrence, but excludes coverage for damage resulting from acts either expected or intended from the standpoint of the insured. We conclude that while coverage may exist under the occurrence provision and the test discussed herein, on the instant facts this question is for the trier of fact and cannot be resolved as a matter of law. Nonetheless, because we find that coverage is precluded under the intentional acts exclusion, Auto Club has no duty to defend or indemnify. We therefore would reverse the judgment of the Court of Appeals.

I

In the instant case, plaintiff sought a determination that its insurance policy does not cover the possible liability resulting from the tort suit brought by Michael Marzonie against Vernon Oaks, an insured under his parents' homeowners' policy. The parties stipulated that the facts and testimony taken from an earlier automobile insurance trial would serve as the record in this case, with the trial judge acting as the trier of fact.

Review of that record indicates that an altercation arose between the occupants of two vehicles driven by Marzonie and Oaks, respectively. Although there is conflicting testimony in the record, apparently somebody in either Marzonie's or Oaks' vehicle made an obscene gesture to the other while stopped at an intersection. In any event, Marzonie stepped out of his vehicle and urged the occupants of the Oaks vehicle to fight. This led to a lengthy, high-speed chase throughout the City of Flint. During the chase, Marzonie and friends threw beer bottles at the Oaks vehicle and, on one occasion, tossed a bottle through an open side window. The chase continued until Oaks drove home and ran, along with the other occupants of his vehicle, into the house. Still in pursuit, Marzonie arrived and stopped in front of the Oaks house, leaving his engine running.

While inside, Oaks apparently heard bottles being thrown at his house and driveway.[1] Nevertheless, instead of calling the police, Oaks retrieved a shotgun from his bedroom, a gun he had never

---

[1] Jeffrey Dingo, a passenger in Marzonie's vehicle, contests this fact, however. Indeed, because Marzonie's head injury left him with no recollection of the evening, Jeffrey Dingo was the only person from Marzonie's vehicle to testify regarding the evening in question.

fired,[2] and proceeded outside to confront and scare
off Marzonie and friends. Upon arriving outside,
he saw Marzonie's vehicle in the street, evidencing
no attempt to leave the premises. Indeed, instead
of leaving, Oaks testified that Marzonie's vehicle
"crept" or drove slowly in his direction,[3] causing
Oaks to respond by aiming and firing the gun at
the grill of Marzonie's vehicle. Because this shot
did not discharge, he fired a second shot, which
actually hit Marzonie.[4] However, not seeing any
visible damage to the vehicle, Oaks believed he
had missed, and, as Marzonie's vehicle began to
back up, Oaks attempted to fire another shot, this
time at the rear tire of the vehicle. When the gun
again misfired, Oaks fired a final shot, striking one
of the rear tires. Marzonie's vehicle then departed,
with Jeffrey Dingo taking control of the vehicle
and driving Marzonie to the hospital. As a result
of these events, Oaks pleaded guilty of careless
discharge of a firearm.[5]

Despite his guilty plea, Oaks testified for pur-
poses of the civil actions that he did not intend to
hit Marzonie, noting that he easily could have shot
Marzonie when he was in front of him, but instead
shot at the grill. Oaks maintained that he simply
wanted to stop the vehicle so the police could be
called.[6]

After oral argument and review of the record,
the trial court held that coverage was not pre-
cluded because the intentional acts exclusion did
not apply. Although properly raised in the com-

---

[2] Oaks testified that he had never fired the gun in question, but had
fired similar shotguns on prior occasions.

[3] Mr. Dingo also contested this fact.

[4] As a result of this incident, Marzonie lost his left eye, lost hearing
in his left ear, and his neck was broken in two places.

[5] MCL 752.861; MSA 28.436(21).

[6] However, Oaks admitted that he never attempted to call the police
once retreating to his house.

plaint, the court never addressed the first question of coverage, i.e., was there an occurrence? Instead, relying on the exclusionary language, the court found no actual intent to injure and no certainty of injury so that an expectation to injure could be inferred as a matter of law.

On appeal, the Court of Appeals affirmed in an unpublished per curiam opinion, issued May 21, 1993 (Docket No. 132237). In reviewing the record under a clearly erroneous standard of review, the Court found there to be an occurrence, noting that the shooting was "an undesigned contingency which was not anticipated or naturally expected." Slip op at 2. Turning then to the intentional acts exclusion, the Court likewise found it not preclusive of coverage. Using a subjective standard, the Court held that Oaks did not intend to injure Marzonie, nor was the injury "the expected or anticipated result of the intentional act of Oaks." Slip op at 2.

This Court granted plaintiff's application for leave to appeal on April 20, 1994.[7]

                          II

In interpreting an insurance policy, we attempt to effect the intent of the parties by first reviewing the policy language. *Auto-Owners Ins Co v Churchman,* 440 Mich 560, 566; 489 NW2d 431 (1992). When the language is clear and unambiguous on its face and does not offend pubic policy, we simply apply the terms as written. *Id.* at 567; *Group Ins Co v Czopek,* 440 Mich 590, 596; 489 NW2d 444 (1992); *Allstate Ins Co v Freeman* and *Metropolitan Property & Liability Ins Co v Di-Cicco,* 432 Mich 656, 667; 443 NW2d 734 (1989). Moreover, if an ambiguity exists, it is resolved in

_____

[7] 445 Mich 862.

favor of the insured, i.e., coverage. *Powers v DAIIE,* 427 Mich 602, 624; 398 NW2d 411 (1986). However, simply because a policy does not define a term does not render the policy ambiguous. *Fireman's Fund Ins Co v Ex-Cell-O Corp,* 702 F Supp 1317, 1323, n 7 (ED Mich, 1988). Instead, absent a policy definition, terms are "given a meaning in accordance with their common usage." *DiCicco, supra* at 666.

Similarly, when construing an exclusionary provision, the language must be "strictly construed against the insurer." *Czopek, supra* at 597. However, if the language is clear and specific, it simply must be applied. Indeed, this Court will not countenance holding "an insurance company liable for a risk it did not assume." *Churchman, supra* at 567; *Kaczmarck v La Perriere,* 337 Mich 500; 60 NW2d 327 (1953).

In the instant case, we are presented with two questions: the first interpreting the scope of coverage, i.e., an occurrence or accident, and the latter construing exclusionary language, i.e., the intentional acts exclusion. This Court has determined that the proper mode of construction first addresses whether coverage exists and then turns to the exclusionary language if necessary. See *DiCicco, supra* at 667-668. Accordingly, we must first decide whether this shooting constitutes an occurrence.

III

In Auto Club's policy, occurrence is defined as an "accident . . . which results . . . in bodily injury or property damage." However, the policy does not define accident. Nevertheless, in *DiCicco, supra,* this Court, applying its common usage to identical policy language, held that "an accident is

an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." *Id.* at 670. While this Court agreed on the statement of this test, a majority of this Court has yet to fully develop the workings and scope of this definition.

In *DiCicco,* we provided only part of the answer by observing that accidents are not limited to unintentional acts. *Id.* at 670. Yet, in applying the definition to the facts of the case, we held that the record was not "clear cut enough" to conclude that there was no occurrence, i.e., whether the insured had any intention of using a knife or whether the victim perceived it as such. *Id.* at 672. Indeed, in *DiCicco,* the insured disavowed any intent to use the knife, instead allegedly harboring the knife in order to scare away his victim. During a skirmish, however, the knife entered the victim's stomach. Thus, construing the term "accident" broadly, it was possible to find the actual use of the knife accidental. Nevertheless, we specifically noted that in appropriate situations "we do not preclude the possibility that an incident may not be considered an 'occurrence' under the coverage section of the policy." *Id.* at 672, n 12.

On the other hand, we found the factual setting in *Czopek, supra,* to be one of these appropriate circumstances. In *Czopek,* the insured intentionally injured two police officers during an attempted arrest. The police officers sought compensation for their injuries, and the insurer sought a declaration that there was no coverage. This Court held that no coverage existed because the act of forcibly resisting arrest did not constitute an occurrence. Indeed, unlike *DiCicco,* this Court found the record clear enough to permit a finding of no occurrence. *Czopek, supra* at 598.

However, neither in *DiCicco* nor in *Czopek* did a majority of this Court specifically address whether the accident should be viewed from the insured's or the injured person's perspective,[8] or how the conduct and resulting injury affect a court's view of the accident.

In *Frankenmuth Mutual Ins Co v Piccard*, 440 Mich 539, 549-550; 489 NW2d 422 (1992), three members of the Court agreed that an accident, although defined differently than in the instant case,[9] should be viewed from the injured person's perspective. Moreover, although the majority in *Czopek* did not address this issue, Justice BOYLE's concurrence explained that under policy language identical to that in the instant case, where the insurer does not designate the perspective in the policy, the accident must be viewed from the injured party's perspective. *Id.* at 608-612. However, this Court has yet to achieve a majority on the issue presented by the parties in this case: the Auto Club arguing that the insured's perspective is controlling and Marzonie contending that the injured person's perspective is controlling.

---

[8] Indeed, in *DiCicco*, "[w]e had no occasion . . . to determine from whose perspective the accidental nature of the event was to be viewed." *Czopek, supra* at 607 (opinion of BOYLE, J.).

Justice GRIFFIN's partial dissent argues that *Czopek* is controlling and that it implicitly determines the existence of an accident from the insured's perspective. While the policy language is the same, this Court did not decide the issue of perspective. Evidence of this fact is demonstrated by reviewing *Frankenmuth Mutual Ins Co v Piccard*, 440 Mich 539; 489 NW2d 422 (1992), which was issued the same day. There, Justices MALLETT and BRICKLEY joined my lead opinion, which found the injured person's perspective controlling. Notably, Justice MALLETT authored the majority opinion in *Czopek*, joined by Chief Justice CAVANAGH and Justices BRICKLEY, RILEY, and GRIFFIN. This inconsistency demonstrates the fallacy of Justice GRIFFIN's contention.

[9] Frankenmuth Mutual defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 547.

Turning first to case law from other jurisdictions, we note that there is a split of authority, at least with respect to assaults, regarding whose perspective is controlling.[10] Indeed, our survey of the cases reveals that both perspectives can be said to further important public policies, with the injured party's perspective promoting the policy of compensating persons for their losses and the insured's perspective deterring persons from engaging in intentional or criminal conduct. *Czopek, supra* at 608-609 (opinion of Boyle, J.). While we are sensitive to these competing policy considerations, our review of the instant policy language and relevant Michigan precedent leads us to conclude that the injured person's perspective is controlling.

From our review of the policy language, we cannot glean any intent with respect to perspective because it simply is not addressed. Accordingly, where the policy is silent with respect to perspective, we would hold that the accidental nature of the event must be evaluated from the injured party's standpoint.[11] See *Ashland Oil, Inc v*

[10] See 72 ALR3d 1090.

[11] In *Guerdon Industries v Fidelity & Casualty Co of New York,* 371 Mich 12, 18; 123 NW2d 143 (1963), this Court considered the term accident in a liability policy. Therein, this Court quoted 10 Couch, Insurance (2d ed), § 41:6, p 27, now at 10 Couch, Insurance, 2d (rev ed), § 41:8, pp 11-12:

"An 'accident,' within the meaning of policies of accident insurance, may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part."

However, even that statement does not resolve the instant question because in one breath the injured person's standpoint is evinced, while in another it is the insured's perspective. In the revised edition, however, it explicitly states that "a determination of whether an 'accident' has occurred must be made from the standpoint of the

*Miller Oil Purchasing Co,* 678 F2d 1293 (CA 5, 1982); *Czopek, supra* at 609 (opinion of BOYLE, J.).[12] In other words, by not designating the perspective in the policy, we would construe this ambiguous language against the insurer and would hold that the injured party's perspective controls.[13] See *DiCicco, supra* at 665.

Moreover, viewing the accident from the injured

insured." *Id.* at 13. Under the instant policy language, however, we reject that contention.

[12] See also Rynearson, *Exclusion of expected or intended personal injury or property damage under the occurrence definition of the standard comprehensive general liability policy,* 19 Forum 513, 521-522 (1984).

[13] Even assuming that the insured's perspective controls, Justice GRIFFIN's dissent apparently rejects traditional rules of construction and imposes a new, more favorable interpretation than anything intended by the drafters or anything that could reasonably be gleaned from the insurance policy itself. Justice GRIFFIN states:

I submit that a principled distinction can be drawn by examining the consequences of the action and determining whether such consequences either were intended by the insured or reasonably should have been expected because of the direct risk of harm intentionally created by the insured's actions. [*Post* at 648-649.]

The contention that liability policies are primarily intended to protect the insured is lost once this broad construction is given to the insurer. Indeed, in applying the policy, he gives the insurer the benefit of any ambiguity rather than the insured and construes the "occurrence" language so broadly in favor of the insurer that the provision specifically directed at excluding this type of conduct, i.e., the intentional acts exclusion, becomes virtually meaningless. The intentional acts exclusion precludes coverage for "bodily injury or property damage which is either expected or intended from the standpoint of the Insured." It is well established in Michigan jurisprudence that this requires an application of a policy-blended *subjective* test. See part v. Justice GRIFFIN, however, rewrites the policy so that the intentional acts exclusion would never be needed because coverage would be barred under the occurrence language, using a test almost identical to the broader, *objective* exclusionary language interpreted in *Freeman, supra.* In interpreting the instant policy, such a view is untenable and unsupported by case law or the policy itself. Accordingly, I submit that instead of creating a "principled distinction," Justice GRIFFIN's test is clearly unprincipled, contrary to traditional interpretations of insurance policies, and obviously contrary to the stricture of the policy itself.

person's standpoint is in accord with Michigan precedent that construed the term accident under an automobile insurance policy. See *State Farm Mutual Automobile Ins Co v Coon,* 46 Mich App 503; 208 NW2d 532 (1973). In *Coon,* the plaintiff-insurer sought a declaration that it had no duty to indemnify the insured for his intentional act of hitting a person with his vehicle. However, the Court of Appeals held that the insurer had a duty to defend, finding that the accident should be determined from the injured person's perspective. *Id.* at 505-508.

In reaching this conclusion, the Court of Appeals relied on *New Amsterdam Casualty Co v Jones,* 135 F2d 191 (CA 6, 1943). In *Jones,* the insured business owner shot a person during a dispute. That person sued the business owner and won a judgment. Thereafter, the injured person sought to collect on the judgment by garnishing the insurance company.

On appeal, the United States Court of Appeals for the Sixth Circuit had to construe the meaning of accident in the policy. It first noted that Michigan and many other jurisdictions have held the intentional infliction of injury to be an accident *except* when the injured person is responsible for it, i.e., an aggressor or one who is otherwise blameworthy for the injuries. *Id.* at 193, citing *Furbush v Maryland Casualty Co,* 131 Mich 234, 237-238; 91 NW 135 (1902) ("The text-books have been slow to admit that [an intentional homicide] is accidental, but the majority of adjudicated cases hold that it is *where the deceased is in no wise responsible for it*"). To justify this result, the court reasoned that the accident must "be determined from the standpoint of the one suffering it, rather than from the standpoint of the one inflicting it . . . ." We agree.

Plaintiff, however, maintains that *Coon* and

other Michigan precedent is distinguishable be-
cause the persons in those cases suffering the
injuries were also the insureds. See, e.g., *Ripley v
Railway Passengers Assurance Co,* 20 F Cas 823
(WD Mich, 1870) (coverage exists for an insured
under a life insurance policy because, although
intentionally killed by another, when viewed from
his perspective, it was an accident); *Peterson v
Aetna Life Ins Co,* 292 Mich 531; 290 NW 896
(1940) (coverage exists under a life insurance pol-
icy because death, when viewed from the injured
person/insured's perspective, was accidental with
regard to him).[14] We have reviewed these authori-
ties and acknowledge the distinction, but we do
not find the distinction dispositive. Rather, we find
no persuasive reason to depart from well-estab-
lished Michigan precedent that has broadly con-
strued accidents, except when the persons seeking
coverage or indemnity are somehow responsible
for the events. Moreover, while Michigan courts
have not directly extended this policy where the
injured person and the insured are different par-
ties, we find precedent from other jurisdictions
that have done so persuasive.[15] In any event, ab-
sent some indication in the policy,[16] the injured
person's perspective appears to be the majority

[14] See also *Reed v Mutual Benefit Health & Accident Ass'n,* 345
Mich 586, 590-591; 76 NW2d 869 (1956); *Hooper v State Mutual Life
Assurance Co,* 318 Mich 384, 390-391; 28 NW2d 331 (1947).

[15] See, generally, 72 ALR3d 1090; Rynearson, n 12 *supra* at 521-522;
see also *Ashland Oil, supra* at 1320.

[16] We again note that the insurer could have explicitly designated
the perspective, but chose not to do so. Thus, construing ambiguous
language against the insurer, see *DiCicco, supra* at 665, we find that
the injured person's standpoint controls when determining whether
an accident occurred.

Moreover, simply because the instant case addresses an indemnity
policy rather than an automobile or life insurance policy is not
dispositive. The insurer could have made the necessary distinction in
the contractual language if it so desired. It did not, and therefore any
ambiguity is construed against the insurer.

rule.[17] Therefore, we find the injured person's perspective controlling.

Furthermore, in reaching this conclusion, we acknowledge but reject the contention that the conduct by itself, without consideration of its possible result, should be determinative of the accidental nature of the event. Such a holding would be contrary to Michigan precedent. Indeed, "we established in [*DiCicco*] that it is possible to have a cause of action where the intentional conduct will result in unintended and unexpected injury thus constituting an 'accident' under the policy language."[18] See *Piccard, supra* at 548-549 (opinion of Riley, J.), citing *DiCicco, supra* at 670. Therefore, we reiterate that, under the instant policy language, and evaluated from the injured person's perspective, an accident may include an unforeseen consequence of an intentional act of the insured.

IV

Finding that the injured party's perspective controls, however, does not end our inquiry. As noted above, precedent in Michigan and throughout the United States generally will refuse to deem an

[17] In *Ashland Oil, supra* at 1320, the Court noted that "[t]his decision aligned Louisiana with the majority view which held that the determination of whether damages are caused by 'accident' must be made from the standpoint of the damaged party rather than from that of the party committing the tort."

[18] Indeed, the instant case is very different from other policies that specifically make conduct the determining factor. For example, in *St Paul Fire & Marine Ins Co v McBrayer*, 801 F2d 1012, 1013, n 2 (CA 8, 1986), the court construed a policy covering "bodily injury or damage to tangible property resulting from an accidental event." The policy further explained that the "accidental event . . . must be something you didn't expect or intend to happen." The court held that the "policy definition of the term 'accidental event' is unique and calculated to avoid liability based on intentional conduct." *Id.* at 1014. Specifically, the court noted that the policy requires that the event be an accident, not also the resulting injury. *Id.*

event an accident where the injured party pro-
vokes the injury, i.e., is an aggressor or is other-
wise blameworthy.[19] In part on the basis of public
policy, this precedent simply recognizes that the
facts and circumstances as a whole must be consid-
ered in applying the definition of accident, i.e.,
under the facts of the case, was the injury foreseen
from the injured party's perspective:

> "An insured who meets death in an affray in
> which he was the aggressor cannot ordinarily be
> said to have suffered his injuries as the result of
> an accident, for he must be held to have foreseen
> the result of his wrongful acts." [*Peterson, supra*
> at 535, quoting *Interstate Business Men's Accident
> Ass'n v Lester,* 257 F 225 (CA 8, 1919).]

In the instant case,[20] there certainly is culpable
conduct on both sides. Beginning with the initial
encounter, the record indicates that somebody in
one of the vehicles made an obscene gesture to the
other, resulting in a high-speed chase by Marzonie
throughout the City of Flint. At one point, while

---

[19] See *Furbush, supra* at 237-238 and cases cited therein; *Peterson,
supra* at 534-536; 72 ALR3d 1090, § 5, pp 1104-1107.

[20] Marzonie maintains that this Court should disregard and not
apply the case law precluding the finding of an accident where the
injured person was the aggressor or otherwise blameful. In essence,
Marzonie contends that this issue was not raised below and therefore
is not preserved on appeal. See *Swickard v Wayne Co Medical
Examiner,* 438 Mich 536, 562; 475 NW2d 304 (1991). Our review of
the record supports Marzonie's theory that this issue was not raised
below. However, we note that consideration of the injured person's
perspective was first squarely presented in Michigan jurisprudence in
1992, shortly before oral argument in the Court of Appeals. Plaintiff
addressed these arguments by supplemental brief in the Court of
Appeals, but essentially contended that the insured's perspective
controls or should control, basing the argument on the lack of
majority in this Court. Marzonie did not file a supplemental brief on
this issue. Indeed, the Court of Appeals did not rule on the issue of
perspective. Given our adoption of the insured party's perspective in
the case at bar and the contested record, we do not decide this issue
as a matter of law. Nonetheless, our conclusion regarding the exclu-
sionary language makes further inquiry on remand unnecessary.

stopped at the intersection, Marzonie stepped out of his vehicle, urging Oaks and friends to engage in a fight. Furthermore, occupants of the Marzonie automobile admitted throwing beer bottles at the Oaks automobile during the chase, with one bottle traveling through the side window of the vehicle.

Further culpable conduct is found once Marzonie arrived at the Oaks house. Oaks indicated that bottles were thrown at his house and driveway, whereas Jeffrey Dingo disputes this contention. Moreover, Oaks testified that when he came outside with the gun, Marzonie's vehicle crept or rolled towards him, whereas Dingo testified that this never happened. Nonetheless, Marzonie did not immediately retreat after Oaks reappeared from the house with the shotgun. Not until after the first and second shots were fired did Marzonie put the car in reverse.

Therefore, we conclude that, given the disputed facts, we cannot, as a matter of law, decide that Marzonie was so blameworthy for the events that developed that the shooting was an undesigned contingency, casualty, happening by chance, out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected. Certainly the dangerous nature of this high-speed chase, the invitation to fight, the admitted throwing of bottles at the Oaks vehicle, and the failure to immediately retreat once Oaks reappeared with the gun, all dictate against finding an accident. However, the resolution of this question is for the trier of fact. While remand would normally be necessary to resolve this question of fact, we turn first to the exclusionary language to determine whether coverage is nonetheless precluded.

V

Auto Club's policy excludes coverage for "bodily

injury or property damage which is either expected or intended from the standpoint of the Insured." In *DiCicco, supra,* a majority of this Court found the language clear and unambiguous and held that the "expected or intended" language requires the application of a policy-blended subjective test.[21] In reaching this conclusion, we noted that the words "intended" and "expected" were designed to expand the policy beyond mere intended injuries.[22] *Id.* at 673. Accordingly, the policy language now precludes coverage for both intended *and* expected injuries.

As previously construed by this Court, coverage is barred for intended injuries if the insured intends some type of injury, albeit that the actual injury was of a different character or magnitude

[21] See *DiCicco, supra* at 679 (opinion of RILEY, C.J.) ("[a]lthough the defendant denies any intent to injure, his actions speak louder than [his] words"); *id.* at 718, n 12, and 720 (opinion of BOYLE, J.) ("[t]hus, as Justice ARCHER observes, *post,* p 731, n 11, the insured need not intend the actual bodily injury inflicted in order to fall under the exclusionary clause." In other words, coverage is precluded if the insured's claim that he "did not expect or intend to cause injury 'flies in the face of all reason, common sense and experience' " [citation omitted]); *id.* at 731, n 11 (opinion of ARCHER, J.) ("I wish to make it clear that the insured need not intend the actual bodily injury inflicted in order to fall within the instant exclusionary clause. It is sufficient that the factfinder conclude the insured subjectively expected some *type* of harm reasonably foreseeable from the insured's standpoint" [emphasis in original]). See also *Churchman, supra* at 576-577 (opinion of RILEY, J.); *Piccard, supra* at 549-550 (opinion of RILEY, J.) ("using the policy-blended subjective standard, . . . we look at the insured's conduct from his perspective and evaluate either his intent to cause some type of injury to an innocent third party or his awareness that harm was likely to follow from the performance of his intentional act").

While I follow this policy-blended subjective test as the majority rule in this state, I still adhere to my opinion in *DiCicco, supra* at 676-678, where I contended that an insured's intent must be reviewed objectively. See also *Churchman, supra* at 573, n 1 (opinion of RILEY, J.).

[22] See, e.g., *Morrill v Gallagher,* 370 Mich 578, 583; 122 NW2d 687 (1963) (Where the policy excludes coverage for injury or destruction " 'caused intentionally by or at the direction of the insured,' " the insurer must show both an intentional act and an intentional injury).

than that intended. See *Churchman, supra* at 577
(opinion of RILEY, J.); *Piccard, supra* at 549-550
(opinion of RILEY, J.). However, coverage is also
precluded for expected injuries where the insured
was "aware[ ] that harm was likely to follow from
the performance of his intentional act."[23] *Piccard,
supra* at 550 (opinion of RILEY, J.). In other words,
coverage is precluded if the insured's claim that he
did not intend or expect the injury " 'flies in the
face of all reason, common sense and
experience.' "[24] See *DiCicco, supra* at 720 (opinion
of BOYLE, J.); *id.* at 682 (opinion of RILEY, C.J.).

In this case, we agree that Oaks intended to
cause property damage, but did not subjectively
*intend* some type of injury within the meaning of
the exclusionary language. However, we are per-
suaded that Oaks did or should have *expected*
injury to follow from his actions and accordingly
find coverage precluded as a matter of law.

The record indicates that instead of calling the
police, Oaks returned from his house with a shot-
gun, a weapon that he had never previously fired,
and directly confronted the Marzonie vehicle. With
this occupied vehicle directly in front of him, Oaks
then fired at the grill of the car, with the unfortu-
nate result of hitting Marzonie in the head. In
light of his inexperience in firing this gun, espe-
cially when aiming at a target that left only a
small margin for error,[25] we are persuaded that
Oaks should have expected that there was a sub-

---

[23] Stated alternatively, " 'the word "expected" denotes that the
actor knew or should have known that there was a substantial
probability that certain consequences will result from his actions,' "
so that the injury can be declared the " 'natural, foreseeable, *ex-
pected,* and anticipated result of an intentional act.' " *DiCicco, supra*
at 674-675 (citations omitted).

[24] This statement of the test would encompass a realization that an
insured's " 'actions sometimes speak louder than words.' " *DiCicco,
supra* at 679 (opinion of RILEY, J.) (citation and emphasis omitted).

[25] We note that this event occurred at night, with the headlights of
the Marzonie vehicle shining directly at Oaks when he fired. With

stantial likelihood that he might miss the grill and hit an occupant of the Marzonie vehicle.

Moreover, we note that Oaks did have some experience with other guns and presumably had some knowledge regarding the operation and mechanics of a gun, including its ammunition. In this case, Oaks admitted that he loaded the shotgun with both slugs and bird shot shells. However, he indicated that at the time of the shooting he did not know what order the shells were arranged. Given this fact, we are persuaded that Oaks' knowledge that the gun was also loaded with bird shot shells[26] satisfies the "expected" language in the policy because he should have expected that some of the shells were likely to spray in an larger radius than the intended target, i.e., the grill, and thus likely hit one of the occupants of the vehicle. The fact that Marzonie was actually injured by a slug rather than a bird shot shell does not change the fact that he should have known that shooting this shotgun, with both slug and bird shot shells, at the front of this occupied vehicle was likely to result in bodily injury rather than simply property damage.

In other words, on these facts, we conclude that the contention that Oaks did not intend or expect this injury "flies in the face of all reason, common sense and experience." His inexperience and training with this gun, the small margin for error given the position of the vehicle, the use of both bird shot and slug shells, and the overall intention in aiming at this occupied vehicle persuade us that coverage is precluded as a matter of law.[27]

this added obstacle, the likelihood of not aiming and hitting the intended target increases.

[26] The record adequately indicates that Oaks knew the difference between a slug that releases only one projectile and a bird shot that releases numerous, small projectiles.

[27] Oaks testified that he "thought the shell had either went [sic]

VI

In sum, with respect to the first question, whether this shooting, which resulted in bodily injury, is covered by the insurance policy, we hold that coverage must be determined by construing the term "accident" from the injured person's perspective. Under this test and on the instant facts, however, this question is left for the trier of fact and therefore cannot be resolved as a matter of law.

Nevertheless, the exclusionary language of this policy precludes coverage as a matter of law and thus makes further consideration of the coverage question unnecessary. Using the policy-blended subjective test, we find that Oaks should have expected bodily injury to result from firing this shotgun at Marzonie's occupied vehicle. Any contention that he did not intend or expect bodily injury to result simply "flies in the face of all reason, common sense and experience." Accordingly, we would reverse the decision of the Court of Appeals and would remand the case for proceedings consistent with this opinion.

Boyle and Mallett, JJ., concurred with Riley, J.

Griffin, J. (*concurring in part and dissenting in part*). Although I agree with the lead opinion's ultimate reversal of the decision of the Court of Appeals, I respectfully dissent from its holding that the incidents at issue may constitute an

over or had went over, over the whole car and everything or it had went off and skidded over the cement . . . ." This admission, along with Oaks' acknowledgment that he is not a expert marksman, further buttresses our conclusion that shooting at an occupied vehicle where the occupants are in a potential line of fire should be precluded from coverage under the instant policy language.

occurrence under the terms of the liability policy. I would hold as a matter of law that the insured's intentional discharge of a firearm at the grill of Marzonie's car was not an accident. Consequently, no "occurrence," within the meaning of the liability policy has transpired, and it is unnecessary to consider the applicability of the exclusionary clause.

An analysis of insurance coverage must necessarily begin with the relevant contractual language. The applicable provisions state:

> This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage . . . *caused by an occurrence.* [Emphasis added.]

An "occurrence" is defined as "an accident . . . which results . . . in bodily injury or property damage." No one disputes that bodily injury resulted from the unfortunate events of the night giving rise to this case. The key question is whether these events can aptly be characterized as an "accident" under the terms of the policy.

Since the policy fails to define "accident," the lead opinion notes that the definition of "accident" adopted by this Court in *Allstate Ins Co v Freeman*, 432 Mich 656, 670; 443 NW2d 734 (1989), applies.[1] The lead opinion concludes that "the instant policy language and relevant Michigan precedent" direct us to view the event from the *injured*'s perspective in determining whether there

---

[1] In *Freeman,* "accident" was defined in this context as:

"an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected."

has been an "accident."[2] I cannot agree. I believe the contractual nature of the policy compels us to view the event from the *insured's* perspective in determining whether it constitutes an "accident." This approach is in accord with relevant Michigan precedent and does not subvert the intent of the contracting parties.

Insurance generally can be defined as a contract between two parties, in which one party (the insurer) agrees to assume the risk of another party (the insured) in exchange for consideration, with the insurer distributing the accepted risk across a group of persons similarly situated with respect to the risk insured.[3] It is the insured whom the policy is intended to benefit and protect; it is *not* intended to directly benefit the claimant.[4] As one leading commentator on insurance has noted:

> Even though the existence of the policy may make it more probable that [the injured] will be able to receive payment, the injured person is neither an "insured" nor a "beneficiary" in the technical insurance-contract . meaning of those terms. That is, in the absence of a specific contract or statutory provision, the person actually injured is not the party insured, and has no rights, legal or equitable, or any title or interest, against the insurer . . . .[5]

Recognizing that liability insurance is primarily intended to benefit the *insured,* as evidenced by his payment of premiums, I believe it is inimical to contract theory to conclude that the *injured's* perspective is controlling in determining whether

---

[2] *Ante* at 634.

[3] See Jerry, Understanding Insurance Law, p 15.

[4] See 11 Couch, Insurance, 2d (rev ed), § 44:1, p 185; 7A Appleman, Insurance Law & Practice, § 4491, p 4.

[5] Couch, n 4 *supra,* § 44:3, p 187.

an "accident" has occurred under the insurance contract. I would conclude that the contractual nature of the policy compels us to view the action or event from the *insured*'s perspective.[6]

Moreover, I do not agree with the lead opinion's assertion that "relevant Michigan precedent" supports its adoption of the "injured" perspective approach. A closer examination of "relevant Michigan precedent" reveals only that confusion has attended our recent excursions into the abyss of insurance "occurrences."

The lead opinion asserts that

> neither in *DiCicco* nor in [*Group Ins v Czopek,* 440 Mich 590; 489 NW2d 444 (1992)] did a majority of this Court specifically address whether the accident should be viewed from the insured's or the injured person's perspective . . . . [*Ante* at 633.]

Yet I suggest a careful reading of the lead opinion in *Czopek* discloses that the *insured*'s perspective was controlling:

> In his deposition, Mr. Smith [the *insured*] admitted that he intended to prevent the arrest. His actions, biting and swinging his arms and legs, were intended to make it impossible for the officers to easily get him into the squad car and on his way to the police station. Because of Arthur Smith's admission in his deposition, we are unwilling to conclude that his resisting arrest, which resulted in injuries to the policemen, was an "accident." It clearly was not an undesigned contingency or something that happened by chance. [*Id.* at 598. Emphasis added.]

On the basis of the *insured*'s admissions, a major-

---

[6] See Sosin & Sherburn, *Insurance law,* 40 Wayne L R 887, 922 (1994).

ity of this Court concluded that his injury-causing actions could not be deemed an "accident." Although the majority in *Czopek* did not expressly declare that the *insured's* perspective was controlling, adoption of the insured's perspective was implicit in its analysis and provided the impetus for the concurring opinion.[7] Since the contractual language in *Czopek* is identical to the language in the case at bar, the position of the lead opinion cannot be reconciled with *Czopek*. I continue to believe *Czopek* was correctly decided, and would apply it to the case before us.[8]

I would analyze this case from the insured's perspective, focusing on the injury-causing *act* or *event* and its relation to the resulting property damage or personal injury. Despite the connotations of the word "accident," we have recognized that an insured need not act unintentionally in order for an act to be an "occurrence."[9] Consequently, a problem arises in attempting to distinguish between intentional acts that can be classified as "accidents" and those that cannot. I submit that a principled distinction can be drawn by examining the consequences of the action and determining whether such consequences either were intended by the insured or reasonably should have been expected because of the direct risk of

[7] See *id.* at 602 (BOYLE, J., concurring).

I write separately to state that because the insurance contract does not require an examination of the accidental nature of the event from the insured's perspective to determine whether an "accident" that resulted in the officers' bodily injuries was an occurrence, the accidental nature of the event must be viewed from the officers' perspective.

[8] Moreover, I note that this Court's decision in *Frankenmuth Mutual Ins Co v Piccard*, 440 Mich 539; 489 NW2d 422 (1992), does not support the conclusion of the lead opinion, since only three members of the Court embraced the "injured" perspective.

[9] See *Piccard, supra* at 548; *Freeman, supra* at 670.

harm intentionally created by the insured's actions. When an insured acts intending to cause property damage or personal injury, liability coverage should be denied, irrespective of whether the resulting injury is different from the injury intended. Similarly, I would hold that when an insured's intentional actions create a direct risk of harm, there can be no liability coverage for *any* resulting damage or injury, despite the lack of an actual intent to damage or injure.[10]

These rules comport with the contractual nature of a liability policy and recognize its inherent function to protect an *insured* from the unintended and unexpected consequences of his actions. Liability insurance does not exist to insulate an insured from the ramifications of his intentional actions designed or reasonably expected to cause property damage or personal injury. Additionally, these rules find support in our decision in *Czopek,* which was signed by five members of this Court. For these reasons, I would apply these rules to the case at bar.

Oaks testified that he did not intend to shoot Marzonie, but intended only to hit the grill of Marzonie's car in order to stop it and to call the police. Oaks' assertion that he did not intend to shoot Marzonie should not remove the bar to coverage arising from his admitted intent to cause property damage. That the nature of the resulting harm differed from the intended harm is irrelevant for purposes of coverage. I would hold that Oaks' actions cannot be characterized as an accident, and consequently, there has been no occurrence. Accordingly, there is no liability coverage for the resulting injuries.

I would reverse the decision of the Court of

---

[10] See *Piccard, supra* at 557 (CAVANAGH, C.J., dissenting).

Appeals and conclude there has not been an "occurrence."

Cavanagh, C.J., and Brickley, J., concurred with Griffin, J.

The following opinion was filed with the Clerk of the Supreme Court on February 13, 1995, after the release of the opinion of the Court on December 29, 1994—Reporter.

Levin, J. (*dissenting*). Plaintiff Auto Club Group Insurance Company issued an insurance policy to defendant Vernon Clifton Oaks providing coverage for liability caused by an "occurrence," defined to mean an "accident," that results in bodily injury neither "expected" nor "intended from the standpoint of the insured."

The question presented in this action for a declaratory judgment is whether Auto Club is subject to liability for damages that might be assessed against Oaks for personal injury suffered by defendant Michael W. Marzonie, II, as a result of the discharge by Oaks of a firearm.

Six justices rule that there is no coverage as a matter of law. Three so rule, not because Oaks intended or expected to cause bodily injury to Marzonie, but because he "*should have* expected bodily injury to result from firing this shotgun at Marzonie's occupied vehicle"[1] (emphasis added) even though, as stated in their opinion,[2] he fired "with the admitted intent only to scare and cause property damage . . . ."[3] The other three justices

---

[1] *Ante,* p 644, Riley, J., Boyle and Mallett, JJ., concurring.

[2] *Id.,* p 627.

[3] Marzonie, Vernon Oaks, and the occupants of their vehicles became embroiled in a dispute in November, 1986, while stopped at an intersection near Flint. After heated words were exchanged, a high-speed chase ensued. Oaks drove his vehicle into the driveway of his parents' house, and entered the house.

Marzonie stopped in front of the house, and began throwing bottles

do not reach the question whether Oaks intended
or expected to cause bodily injury to Marzonie.
They so rule as a matter of law for Auto Club
because they conclude that Oaks' liability to Mar-
zonie was not caused by an "occurrence"/"acci-
dent"; they so conclude, not because Oaks dis-
charged the firearm intentionally, but because he

at the house and driveway. Oaks retrieved a shotgun, with which he
claims he hoped to scare Marzonie, and went outside.

Marzonie's vehicle began to creep up the driveway. Oaks aimed the
gun at the vehicle's grill and fired a shot in the hope, he said, of
preventing the vehicle from approaching closer. After the first shot
failed to fire, Oaks fired again. Oaks did not see the second shot hit
the vehicle, and thought he had missed. Unbeknownst to Oaks, the
shot had struck Marzonie. Marzonie's vehicle began to back up,
turned, and then started to move away. Oaks aimed a third shot at
the rear tires in an effort to stop the vehicle. This shot did not fire.
Finally, Oaks fired a fourth shot that hit one of the rear tires.

Auto Club commenced this action, seeking a declaration that cover-
age under a homeowner's policy issued to Oaks' parents was excluded.
The parties stipulated that the testimony and other evidence submit-
ted to the jury in a related case (*Marzonie v Auto Club Ins Ass'n,* 441
Mich 522, 523-526; 495 NW2d 788 [1992], rev'g 193 Mich App 332; 483
NW2d 413 [1992]) would be the record on which the circuit judge, as
trier of fact, would decide the factual questions in this action. The
judge found for Marzonie, and that there was coverage; he said: "[i]t
cannot be concluded there was a certainty to produce injury which
would require an inference there would be an expectation to cause
that result. The firing of the weapon in this case could not, from the
insured's standpoint, cause the injury which came about." The Court
of Appeals affirmed. *Auto Club Group Ins Co v Marzonie,* unpublished
opinion per curiam, issued May 21, 1993 (Docket No. 132237).

The Court of Appeals said:

[T]he shooting of Marzonie was an undesigned contingency
which was not anticipated or naturally expected. Oaks' inten-
tional shooting at the car resulted in an unintended and
unexpected injury to Marzonie, thereby constituting an occur-
rence within the terms of the homeowner's policy issued by
plaintiff.

The Court added that under the subjective standard enunciated by
this Court in *Metropolitan Property & Liability Ins Co v DiCicco,* 432
Mich 656; 443 NW2d 734 (1989), and followed in *Frankenmuth Mutual
Ins Co v Piccard,* 440 Mich 539; 489 NW2d 422 (1992), *Group Ins Co of
Michigan v Czopek,* 440 Mich 590; 489 NW2d 444 (1992), and *Auto-
Owners Ins Co v Churchman,* 440 Mich 560; 489 NW2d 431 (1992), the
trial court's conclusion that Oaks intended to shoot Marzonie's vehi-
cle, but not Marzonie, was not clearly erroneous.

discharged the firearm with the intent to damage Marzonie's automobile.[4]

I would hold that whether the personal injury suffered by Marzonie was expected or intended, or accidental, should be decided from the standpoint of Oaks, the insured, and, because that depends on the facts and circumstances of the discharge by Oaks of the firearm, the meritorious question cannot be decided as a matter of law. Since the trier of fact decided[5] that the injury was neither expected nor intended by Oaks, the injury was a result of an occurrence/accident although the discharge of the firearm was intentional and Oaks intended to damage Marzonie's automobile and hence cause property damage.

I

Before the 1966 revision of the standard general liability policy, liability policies generally provided coverage for personal injury caused by an "accident."[6] Because "accident" was not defined in the policy, courts developed judicial definitions. There were many definitions[7] designed to implement the fundamental principle that insurance provides coverage for fortuitous losses.[8]

It became well established that where the consequences of intentional acts were unintended, the loss was accidental, and, hence, there was insurance coverage for unintended losses resulting from

[4] Ante, pp 645 and 649, GRIFFIN, J., CAVANAGH, C.J., and BRICKLEY, J., concurring.

[5] See n 3.

[6] See ns 12, 14 and 16.

Some pre-1966 policies specifically excluded coverage for loss "caused intentionally by or at the direction of the insured." See Morrill v Gallagher, 370 Mich 578, 583; 122 NW2d 687 (1963); Putman v Zeluff, 372 Mich 553, 555; 127 NW2d 374 (1964).

[7] See n 21 and accompanying text.

[8] Keeton & Widiss, Insurance Law, § 5.3, p 475.

intentional conduct.[9] A treatise explains that because "[f]ortuity, or the lack thereof, is primarily a matter of intent," in insurance law, "questions about intent focus on the *consequences,* not the *acts.*" (Emphasis in original.)[10]

Although the concept of fortuity generally involves an analysis whether the insured "intended the consequences,"[11] many courts concluded that the question whether there was an accident should be decided from the standpoint of the injured person.[12]

A

The insurance industry accepted the judicial construction that liability policies provide coverage for unintended consequences of intentional acts, but not judicial decisions that provided coverage for "expected" consequences that the courts were not prepared to find were actually intended. Nor did the industry accept judicial decisions determining coverage from the standpoint of the injured person. As part of a comprehensive revision of the general liability policy, the standard policy was revised in 1966 to exclude coverage where the

---

[9] Accordingly, we find that ascertaining the insured's "intent" may determine whether the insured's actions constituted an "accident," but *it does not necessarily follow that an insured must act unintentionally for an act to be an "occurrence."*[10]

[10] See, generally, 10 Couch, Insurance, 2d (rev ed), §§ 41:7 *et seq.*

[*Allstate Ins Co v Freeman,* 432 Mich 656, 670; 443 NW2d 734 (1989) (opinion of RILEY, C.J.). Emphasis added.]

In *Piccard,* n 3 *supra,* p 548 (opinion of RILEY, J.), the lead opinion, signed by three justices, said that there may be coverage "where the intentional conduct will result in unintended and unexpected injury thus constituting an 'accident' . . . ."

[10] Keeton & Widiss, n 8 *supra.*

[11] *Id.*

[12] 11 Couch, Insurance, 2d (rev ed), § 44:288, p 444.

consequences of the insured's conduct, the injury, was "expected" as well as where it was actually intended, and to determine whether the injury was expected or intended from the standpoint of the insured rather than the standpoint of the injured person.[13]

The Insuring Clause was revised in 1966 to read:

"The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies caused by an occurrence . . . .

" 'Occurrence' is defined to mean:

. . . an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."[14]

The insurance policy issued by the Auto Club to Oaks is substantively the same as the 1966 revision of the standard general liability policy. The Auto Club policy provides that it will pay on behalf of the insured sums that the insured becomes legally obligated to pay as damage because of bodily injury "caused by an occurrence." The term "occurrence" is defined to mean "an accident" that "results, during the policy term, in bodily injury or property damage." In a separate clause, the policy excludes coverage for "bodily injury or property damage which is either ex-

[13] See *Czopek,* n 3 *supra,* p 609, n 10 (BOYLE, J., concurring).

[14] Tarpey, *The new comprehensive policy: Some of the changes,* 33 Ins Couns J 223 (1966).

Another or later version substitutes "continuous or repeated" for "injurious," and eliminates "during the policy period." See Couch, n 12 *supra,* § 44:285, p 437; Rynearson, *Exclusion of expected or intended personal injury or property damage under the occurrence definition of the standard comprehensive general liability policy,* 19 Forum 513 (1984).

pected or intended from the standpoint of the insured."[15]

B

The 1966 revision provides coverage for injury caused by an "occurrence." " 'Occurrence' *means* an accident." (Emphasis added.) Thus, coverage is provided for injury caused by accident.

It is then provided that a covered accident is one "which results . . . in injury . . . neither expected nor intended from the standpoint of the insured." Thus, coverage is provided, somewhat circularly, for an injury *caused* by an accident that *results* in an injury neither expected nor intended.

Eliminating the circularity, coverage is provided

---

[15] The Auto Club policy provides:

COVERAGES

COVERAGE E—PERSONAL LIABILITY

This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence. . . .

\* \* \*

"[O]ccurrence": means an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.

\* \* \*

EXCLUSIONS

This policy does not apply:

1. Under Coverage E-Personal Liability and Coverage F-Medical Payments to Others:

\* \* \*

f. to bodily injury or property damage which is either expected or intended from the standpoint of the insured.

for an accident that results in bodily injury neither expected nor intended.

There were a number of components of the various judicial definitions of what constitutes an "accident," including the concept that an accident is a "sudden event which is identifiable in time and place . . . ." In defining "accident" to include "injurious exposure to conditions," the 1966 revision also accepted judicial decisions that eliminated the sudden-and-unexpected-event-identifiable-in-time-and-place requirement.[16]

There were still other components in judicial definitions of accident. Some definitions exclude foreseeable consequences, but, because foreseeability generally equates with negligence, this might mean that there would be no coverage for negligent conduct and "would result in a liability policy of no significant value to the insured."[17]

In *Frankenmuth Mutual Ins Co v Piccard,* 440 Mich 539, 547; 489 NW2d 422 (1992) (opinion of Riley, J.), the lead opinion[18] observed that in the lead opinion[19] in *Allstate Ins Co v Freeman,* 432 Mich 656; 443 NW2d 734 (1989) (opinion of Riley, C.J.), this Court considered the meaning of "acci-

---

[16] Wendorff, *The new standard comprehensive general liability policy,* ABA Section on Ins, Neg & Comp Law (1966 proceedings), pp 250, 253.

[17] Rynearson, n 14 *supra,* p 515.

It is fundamental that liability policies provide coverage for negligent acts or conduct of the insured. *Cross v Zurich General Accident & Liability Ins Co,* 184 F2d 609, 611 (CA 7, 1950).

"The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to *forewarn him that the results are highly likely to occur."* [*Freeman,* text accompanying n 19, p 675, quoting *City of Carter Lake v Aetna Casualty & Surety Co,* 604 F2d 1052, 1059, n 4 (CA 8, 1979). Emphasis added.]

[18] Signed by three justices.
[19] Signed by two justices.

dent," as used to define "occurrence,"[20] and the following definition was offered:

[A]n accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.[21]

Since coverage under occurrence-based policies is predicated on a finding of "accident," it is understandable that courts continue to address the question whether there is an "occurrence"/"accident," as well as whether the injury was expected or intended. This is nevertheless somewhat circular because it is difficult to conceive of an injurious

---

[20] In the companion case, *Metropolitan Property & Liability Ins Co v DiCicco.*

[21] In *Czopek*, n 13 *supra*, p 597, this Court quoted more fully from *Guerdon Industries, Inc v Fidelity & Casualty Co of New York*, 371 Mich 12, 18; 123 NW2d 143 (1963), the source of the definition quoted in *Freeman/DiCicco* and *Piccard*:

An "accident" within the meaning of policies of accident insurance may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.

The *Guerdon* definition was taken from 10 Couch, Insurance (2d ed), § 41:6, p 27, which Justice OTIS M. SMITH, the author of the opinion, said, (*Guerdon, supra*, p 18) was of "1962 vintage and reflects what is currently understood by the word 'accident' as used in such a policy," a comprehensive general and automobile liability policy. It will be noted that the definition speaks both from the standpoint of the injured person and the standpoint of the insured.

There are four decisions of this Court construing the 1966 revision of the standard general liability policy. The instant case of *Marzonie*, the companion case of *DiCicco* in *Freeman/DiCicco*, *Piccard*, and *Czopek*. Three justices signed the lead opinion in the instant case, *Marzonie*, two signed *Freeman/DiCicco*, three signed *Piccard*, and five, a majority, signed *Czopek*.

consequence neither expected nor intended that would not be an accident within the meaning of the coverage.

An injury neither expected nor intended is "an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." As stated by three justices in *Piccard, supra,* p 548, there may be coverage "where the intentional conduct will result in unintended and unexpected injury *thus constituting an 'accident'* . . . ." (Emphasis added.)

A finding or conclusion that an injury neither expected nor intended is not an accident would, I venture, stem from misanalysis focusing on the act or conduct of the insured[22] rather than the injurious consequence, and would be contrary to the insurance law principle that "questions about intent focus on the *consequences,* not the *acts.*"[23] (Emphasis in original.)

Focusing on the act or conduct would also be contrary to the language of the policy. The act or conduct of the insured giving rise to liability is not in itself an, or the, occurrence. An insured's act or conduct becomes an "occurrence" only if it was an accident. And whether the insured's act or conduct was an accident turns on whether the consequence, the injury—not the act or conduct—was expected or intended.

---

[22] I acknowledge that reasonable inferences concerning the insured's intent may be drawn from his acts or conduct.

[23] See n 10.

One commentator stated:

"The coverage under the new policy has been *broadened* to an 'occurrence' basis." [Wendorff, n 16 *supra,* p 252. Emphasis added.]

II

Three justices are of the opinion that the "accident" inquiry should continue to be decided from the standpoint of the injured person. This view or reading of the language of the policy is contrary to the 1966 revision's purpose to determine coverage from the standpoint of the insured and not the standpoint of the injured person.

The drafters of the 1966 revision did not intend that, while the question whether the *injury* was expected or intended would be determined from the standpoint of the insured, there would continue to be a separate and preceding inquiry whether there was an *"occurrence"/"accident"* from the standpoint of the injured person.[24] As a result of the 1966 revision, adopted in the Auto Club policy, both the coverage and exclusion questions are to be decided from the standpoint of the insured, rather than the standpoint of the injured person.

Another three justices are similarly of the opinion that there should continue to be a separate and preceding inquiry whether there was an "occurrence"/"accident" that was an accident. They conclude that where the intentional conduct re-

---

[24] Those three justices would read the definition of "occurrence" in the 1966 revision as if the words underlined in the following revision of that definition were added:

> . . . an accident, including injurious exposure to conditions, determined from the standpoint of the person suffering loss, which results during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured.

I acknowledge that the words "bodily injury or property damage neither expected nor intended from the standpoint of the insured" are set forth in the Auto Club policy in an exclusion rather than in the definition of occurrence. That locational difference does not change the meaning of the policy or the coverage provided. But see *Czopek,* n 13 *supra,* pp 596, 612 (BOYLE, J., concurring).

sulted in both expected/intended and unexpected/unintended consequences, the injury was not caused by an "occurrence"/"accident." I am unable to agree. The 1966 revision's purpose of precluding coverage where an unintended consequence is expected as well as where the consequence is intended, did not include precluding coverage for unexpected consequences simply because there were other consequences that were expected or intended.

When it was decided, long before 1966, that unintended consequences of intentional acts were covered unless, since the 1966 revision, the unintended consequence was expected or intended from the standpoint of the insured, it was decided that the focus should be on whether the consequence giving rise to liability was expected or intended, and not the insured's conduct.

A single volitional act of an insured may give rise to consequences both expected/intended and unexpected/unintended. In such a case, because a golden thread in insurance law is that "questions about intent focus on the *consequences,* not the *acts*" (emphasis in original),[25] and whether conduct is an accident turns on whether the consequence is expected or intended, it necessarily follows, although one might intuitively feel otherwise, that the single volitional act of the insured gives rise to an "accident" where the consequence is unexpected/unintended, and to a happening or event that is not an "accident" where the consequence is expected/intended.[26]

---

[25] See n 10.

[26] The lead opinion in *Piccard,* text accompanying n 18, *supra,* p 553, in stating that "the 'accident' occurred when [fireman] Deane unexpectedly fell from the roof of Piccard's music store," recognizes in effect that more than one "occurrence"/"accident" might be seen as arising from singular conduct of the insured—in *Piccard,* the torching of the building, and, separately, the fireman falling from the

Since whether conduct is an accident turns on whether the consequence is expected or intended, when the conduct results in both expected/intended and unexpected/unintended consequences, there is no more reason to conclude that the conduct is not an accident than that it is. To conclude otherwise is to focus on the conduct rather than whether the consequence is expected or intended.

In many, possibly most, cases, there will be but one consequence of the insured's conduct, not both unexpected/unintended consequences and expected/intended consequences. Denying coverage for unexpected/unintended consequences where there is adventitiously expected/intended consequences is unexamined line-drawing unrelated to any 1966 revision purpose or the history of adjudication that gave rise to the 1966 revision.

It truly elevates form over substance to say that the insured and the injured person are unprotected by insurance coverage for the kind of devastating loss that is involved in the instant case because the insured intended comparatively minor damage to Marzonie's automobile. Defeating coverage in the instant case because comparatively minor property damage was intended is a cramped reading of "occurrence"/"accidental" inconsistent with judicial decisions preceding the 1966 revision and the drafting history and purpose of the 1966 revision.

Having in mind that (i) before the 1966 revision, it was well established that coverage was provided for unintended consequences of intentional acts, and, hence, that intentional conduct was accidental where the injury was unintended, and (ii) "questions about intent focus on the *consequences,*

roof of the store; in the instant case, damage to Marzonie's automobile, and, separately, the physical injury to Marzonie.

not the *acts*"[27] (emphasis in original), and (iii) the purpose of the 1966 revision was to provide coverage where the consequences were expected as well as where they were intended, and not to change the focus from the consequences to the act or conduct of the insured,[28] it is inexplicable that an injury neither expected nor intended is yet not an accident, or becomes not an accident because another injury, particularly one, as here, comparatively minor was intended.

### III

The meritorious question is whether the injury suffered by Marzonie was expected or intended from the standpoint of Oaks, the insured. Three justices conclude that the injury was expected or intended, and three do not reach that question because they decide that there was no occurrence/accident.

In *Buczkowski v Allstate Ins Co,* 447 Mich 669; 526 NW2d 589 (1994), decided the day after *Marzonie* was decided, this Court affirms a decision of the Court of Appeals that Allstate had a duty to indemnify its insured for injuries suffered by Buczkowski when the insured fired his shotgun with the intent of hitting Buczkowski's truck but a bullet ricocheted and hit Buczkowski. The majority of the Court of Appeals, in an unreported opinion, found that whether the injury "may reasonably be expected to result" from the insured's actions within the meaning of an exclusion in the Allstate policy[29] was a question of fact for the jury.

[27] See n 10.

[28] See the last paragraph of part I, immediately following n 23.

[29] The Allstate policy involved in *Freeman* and *Buczkowski* was not an occurrence-based policy, did not use the words "occurrence" or "accident," did not incorporate the language of the 1966 revision of

This Court affirmed in *Buczkowski,* three justices agreeing with the reasoning of the Court of Appeals, and one justice concurring in that result. I signed both opinions for affirmance. I signed the concurring opinion because I agreed with the concurring justice that it was not "highly likely"[30]

the standard general liability policy, but provided that Allstate would pay all sums that an insured person becomes legally obligated to pay as damages because of bodily injury or property damage with the following exclusion:

> We do not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which is in fact intended by an insured person.

[30] It appears that there is general agreement that an injury is expected when it is "highly likely." *Buczkowski,* text accompanying n 29 *supra,* opinion of BRICKLEY, J., p 672; opinion of BOYLE, J., p 676; *Freeman, supra.*

In *Bolin v State Farm Fire & Casualty Co,* 557 NE2d 1084, 1089 (Ind App, 1990), an Indiana appellate court distinguished between intended and expected injury in a firearm injury case:

> "Intended" has been defined as a volitional act with conscious *desire to bring about certain results* (see *Allstate Ins Co v Herman* (1990) Ind., 551 NE2d 844, citing *Home Ins Co v Neilsen* [165 Ind App 445; 332 NE2d 240 (1975)]) and "expected" as a slightly broader category which includes conscious *awareness that desired results* are practically certain to occur. [Emphasis added.]

See also *Patrons-Oxford Mutual Ins Co v Dodge,* 426 A2d 888, 892 (Me, 1981).

In *Indiana Farmers Mutual Ins Co v Graham,* 537 NE2d 510 (Ind App, 1989), another Indiana appellate court earlier considered the exclusion for "bodily injury or property damage which is either expected or intended from the standpoint of the insured" in an occurrence-based policy. The insureds' farm was quarantined because their hog herd had become infected. The insureds sold the infected animals with notice of the disease and quarantine to a broker, who resold them, without notice of the disease or quarantine, to the plaintiff in the underlying action, whose herd had become infected. It was held that the insureds did not "expect" damage from the sale of infected animals within the meaning of the exclusionary clause absent evidence they were consciously aware that the resulting property damage to the plaintiff in the underlying action was "practically certain" to occur when they sold the herd to the broker with disclosure of the herd's infection and quarantine.

that the discharge of the firearm aimed at Bucz-
kowski's unoccupied truck would result in per-
sonal injury. I signed the lead opinion because I
agree with the other signers of that opinion and
the Court of Appeals that ordinarily the question
what is expected or intended by the insured,
whether assessed subjectively or objectively,
should be decided by the trier of fact.[31]

*Buczkowski* and *Marzonie* are distinguishable on
the basis that the vehicle in *Buczkowski* was un-
occupied and the vehicle in *Marzonie* was occu-
pied. While this factual difference is important,
and it is, indeed, more likely that personal injury
will result from the firing of a gun at an occupied
vehicle than at an unoccupied vehicle, a court may
not in effect direct a verdict for the insurer declar-
ing that there is no coverage unless—where the
question arises (as in *Czopek, DiCicco, Piccard* and

[31] The question whether the insured expected or intended to cause
injury was decided in *Marzonie, Freeman, Czopek, DiCicco, Piccard*
and *Churchman,* n 3 *supra,* as questions of law. *Buczkowski* is the
first case in which three justices, in the lead opinion, recognize that
the question is generally one of fact to be decided by the trier of fact.
(In *DiCicco,* n 20 *supra,* p 711, it was recognized that the disposition
of the declaratory judgment action did not involve a determination of
the insurer's duty to indemnify.)

Although this is an action for a declaratory judgment, questions of
fact are to be decided by a trier of fact. See 22A Am Jur 2d,
Declaratory Judgments, §§ 228-230, pp 867-872. In *Brohawn v Trans-
america Ins Co,* 276 Md 396; 347 A2d 842 (1975), Maryland's highest
court said that where the ultimate issue would be decided in a
pending action brought by a third party, "it is inappropriate to grant
a declaratory judgment."

The lead opinion in the instant case of *Marzonie* would hold that
the injured party's, rather than the insured party's, perspective
controls, and concludes that "given the disputed facts, we cannot, as a
matter of law, decide that Marzonie was so blameworthy for the
events that developed that the shooting was an undesigned contin-
gency, casualty, happening by chance, out of the usual course of
things, unusual, fortuitous, not anticipated, and not naturally to be
expected. . . . However, the resolution of this question is *for the trier
of fact.*" RILEY, J., *ante,* p 640. (Emphasis added.) The language of the
test or standard followed in the lead opinion is based on the *Guerdon*
definition adopted in *Freeman/DiCicco, Piccard* and *Czopek.* See n 21.

*Marzonie*[32]) under the occurrence-based language
of the 1966 revision of the standard general liabil-
ity policy—all reasonable persons must agree that
personal injury was subjectively[33] expected or in-
tended, or—where the question arises (as in *Free-
man* and *Buczkowski*) under the Allstate policy—
all reasonable persons must agree that personal
injury was objectively[34] reasonably to be expected.

[32] The Auto-Owners policy in *Churchman,* n 31 *supra,* p 566, was
not an occurrence-based policy. As in the Allstate policy considered in
*Freeman* and *Buczkowski* (see n 29), neither "occurrence" nor "acci-
dent" was used. Nor did the policy incorporate the language of the
1966 revision of the standard general liability policy. The policy
provided that Auto-Owners will pay all sums that an insured person
becomes legally obligated to pay because of bodily injury, but cover-
age was excluded for bodily injury "expected or intended by an
insured person." This is at least as clearly subjective as the 1966
revision of the standard general liability policy.

[33] *Freeman, supra* (opinion of RILEY, C.J., p 688; opinion of BOYLE,
J., p 709).

[34] *Freeman, supra* (opinion of BOYLE, J., pp 709-710). In *Churchman,*
n 31 *supra,* p 567, a majority said that in *DiCicco,* this Court
considered policy language similar to that in *Churchman* "and found
that because the policy language included the phrase ' "from the
standpoint of the insured," ' subjective intent was required. *Id.* at
708."

In a concurring opinion in *Churchman,* n 31 *supra,* (opinion of
RILEY, J., p 579), an opinion signed by two justices, declared that in
*DiCicco,* this Court adopted a "policy-blended subjective standard"
that requires that "the insurer need only establish that the insured
intended to cause the victim some type of harm, not that he specifi-
cally intended to cause the injury as a consequence of his action,"
citing the several opinions in that case, none of which were signed by
more than two justices.

The view that this Court adopted a "policy-blended subjective test"
in *DiCicco* is reiterated in the lead opinion in the instant case
(opinion of RILEY, J., *ante,* p 635, n 13, p 641, n 21).

In *Piccard, supra* (opinion of RILEY, J., pp 549-550), the view was
expressed that in applying the "policy-blended subjective standard"
"we look at the insured's conduct from his perspective and evaluate
either his intent to cause some type of injury to an innocent third
party or his awareness that harm was likely to follow from the
performance of his intentional act." The lead opinion concluded that
"Piccard's intent to cause property damage is irrelevant" and that
"the record is devoid of any suggestion that Piccard intended to
injure" the firefighter. *Piccard,* n 18 *supra,* p 553.

For reasons stated commencing with the third paragraph of part II,
I do not agree that coverage should be denied because the insured

Courts in other jurisdictions have generally held that where the facts are in dispute, or where differing inferences may reasonably be drawn from undisputed facts, the question whether injury is expected or intended is to be decided by a trier of fact and not by the court as a matter of law.[35] A number of cases so holding involved injuries caused by the discharge of firearms.[36]

intended "to cause the victim some type of harm" unless he expected or intended to cause the harm or consequence that gave rise to the claims in suit.

[35] *Allstate Ins Co v Sparks,* 63 Md App 738; 493 A2d 1110 (1985) (destruction of a mill when the insured ignited gas fumes while attempting to steal gas); *Northwestern Nat'l Casualty Co v Phalen,* 182 Mont 448; 597 P2d 720 (1979) (injuries suffered when the insured tripped the victim and he crashed on his face). Both cases were occurrence-based policies excluding recovery for loss expected or intended from the standpoint of the insured. *Indiana Farmers Mutual Ins Co v Graham* (discussed in n 30 *supra;* the exclusion was stated in the same language as the two preceding cases, but the report does not indicate whether the policy was occurrence-based); *Caspersen v Webber,* 239 Minn 93; 213 NW2d 327 (1973) (the insured pushed a hatcheck girl, causing her to lose her balance and strike her back against a metal message rack; the policy excluded injury caused intentionally by the insured).

[36] *Patrons-Oxford Mutual Ins Co v Dodge,* n 30 *supra* (the insured shot the victim with a shotgun and was convicted of aggravated assault—held not barred from having the jury determine whether the injury was expected or intended); *Alabama Farm Bureau Mutual Casualty Ins v Dyer,* 454 So 2d 921 (Ala, 1984) (the insured fatally shot his brother and then committed suicide); *Talley v MFA Mutual Ins Co,* 273 Ark 269; 620 SW2d 260 (1981) (the victim was hit when he traded a round of shots with the insured as the insured circled the block, shooting out vehicle windows). These cases were occurrence-based policies with the same exclusion as in the instant case.

See *Lyons v Hartford Ins Group,* 125 NJ Super 239; 310 A2d 485 (1973), cert den 64 NJ 322; 315 A2d 411 (1974) (a warning shot was fired by the insured at an automobile); *Garden State Fire & Casualty Co v Keefe,* 172 NJ Super 53; 410 A2d 718 (1980), cert den 84 NJ 389; 420 A2d 317 (1980) (a gun was used to frighten, not injure); *Vanguard Ins Co v Cantrell,* 18 Ariz App 486; 503 P2d 962 (1972), aff'd 110 Ariz 184; 516 P2d 320 (1973) (a gun was used in a robbery to frighten, not harm); *Colonial Penn Ins Co v Hart,* 162 Ga App 333; 291 SE2d 410 (1982) (the court affirmed judgment for the insured who fired pellets with the intent of frightening the victim); *Barry v Romanosky,* 147 AD2d 605; 538 NYS2d 14 (1989) (the insured shot at the door of a dance club and injured a person inside); *Physicians Ins Co of Ohio v Swanson,* 58 Ohio St 3d 189; 569 NE2d 906 (1991) (the insured shot a

Since it appears that a subjective standard[37] is stated in the Auto Club's policy and an objective standard in the Allstate policy, one would think that there is less reason to decide, as a matter of law, the question whether Oaks expected or intended to injure Marzonie than whether McKay expected or intended to injure Buczkowski.

I would hold that it was for the trier of fact, and not for this Court as a matter of law,[38] to decide on the basis of the facts and circumstances of the discharge by Oaks[39] of the firearm, whether Oaks

---

BB gun at a group with the purpose of scaring, and the victim was hit when he turned toward the insured); *Espinet v Horvath,* 157 Vt 257; 597 A2d 307 (1991) (the insured shot the victim after a long evening of drinking and during an argument); *Stidham v Millvale Sportsmen's Club,* 421 Pa Super 548; 618 A2d 945 (1992) (shooting during an argument in a tavern); *Green v Allstate Ins Co,* 177 AD2d 871; 576 NYS2d 639 (1991) (coverage was found, despite a guilty plea, when the insured recklessly fired a slingshot into a crowd with no particular purpose); *Bolin v State Farm Fire & Casualty Co,* discussed in n 30 *supra* (coverage was found where the insured pleaded guilty of criminal recklessness for firing a gun at the rear of the victim's truck); *Allstate Ins Co v Zuk,* 78 NY2d 41; 574 NE2d 1035; 571 NYS2d 429 (1991) (coverage was found even though the insured pleaded guilty of reckless crime where the victim was killed when a gun accidentally discharged while being cleaned by the insured); *State Farm Fire & Casualty Co v Muth,* 190 Neb 248, 272; 207 NW2d 364 (1973) (insured shot a BB gun at the victim's vehicle, injuring the victim's eye).

[37] But see n 34.

[38] It is, again, noteworthy, that while six justices rule that there is no coverage as a matter of law, only three justices so rule on the basis that Oaks expected or intended—or, more precisely, "*should have* expected"—to cause bodily injury. One of the three justices signed the lead opinion in *Buczkowski* which found that the question was one of fact to be decided by the trier of fact.

The other three justices rule that there is no coverage, as a matter of law, because there was no "occurrence"/"accident" since the discharge of the firearm was with the intent to damage Marzonie's automobile. Those three justices, including two who signed the lead opinion in *Buczkowski,* do not reach, or express an opinion on, the question whether Oaks expected or intended to cause bodily injury.

[39] The credibility of Oaks' assertion that he retrieved the shotgun to frighten Marzonie, and fired it to forestall Marzonie's vehicle from proceeding further up the driveway, and that he did not intend to injure Marzonie, was resolved by the trier of fact for Oaks and Marzonie. The judge's findings were not clearly erroneous.

expected or intended to cause the personal injury suffered by Marzonie, and thus whether what occurred was accidental and covered by the policy of insurance issued by Auto Club.