Young, J.
(dissenting in part). I agree with the majority that this case should be remanded to the Court of Appeals so that the applicability of the inten *292 tional act and criminal act policy exclusions can be decided. However, I respectfully dissent from that portion of the majority opinion that concludes that the policy provides indemnity coverage because the majority finds that the shooting incident here constituted an “accident” and thus an “occurrence” under the policy. The majority essentially adulterates any consistent or coherent application of the standards set forth by this Court just two terms ago in Masters[1] and later applied in Nabozny[2] concerning the differentiation between an accident and an intentional act. The majority’s effort to distinguish the facts of this case from Masters and Nabozny are hollow and simply debases the clear standard set forth in those opinions.
I believe that the application of the definition of the term “accident” we recently announced in Masters and Nabozny, in which we construed identical policy language, requires an objective view of the insured’s actions.
Under the facts of this case, the insured should have reasonably expected the consequences created by pointing a gun at another and pulling the trigger without checking to verify that it was unloaded. Accordingly, I would affirm summary disposition in favor of plaintiff.
I. ADDITIONAL FACTS
According to Robert McCam’s deposition testimony, he and Kevin LaBelle went to McCam’s house *293 after school. At some point in the afternoon,[3] McCam retrieved his .410 shotgun from under his grandfather’s bed. Both boys handled the weapon.
LaBelle and McCam argued over crackers; LaBelle had the crackers and refused to share them with McCam when asked to do so. Attempting to frighten LaBelle into sharing the crackers,[4] McCam intentionally pointed the shotgun at LaBelle with the barrel being approximately one foot away from LaBelle’s face. McCam again asked LaBelle for the crackers, but LaBelle declined to share them. McCam pulled the hammer back, pretended to pull the trigger “a couple” times, and then actually pulled the trigger. The weapon discharged and LaBelle was killed. As a result of the death, McCam pleaded nolo contendere to manslaughter, MCL 750.321.
In both his statement to the police and his deposition testimony, McCam stated that he thought the gun was unloaded and would simply “click” when the trigger was pulled. McCam acknowledged, however, that he did not check the gun to verify that it was unloaded before pulling the trigger. McCam stated that he had owned the gun “for at least a year” before the shooting and had successfully completed a gun safety course. He also admitted that he had last used the gun without his grandparent’s permission for tar *294 get practice weeks before the shooting. On this prior occasion, McCam was “in a hurry” to put the gun away because he did not want his grandparents to catch him using the weapon without their supervision. McCam could not recall if he had unloaded the shotgun in his hurry to put the weapon away.
II. MASTERS AND NABOZNY
The policy language in this case and in Masters and Nabozny are identical. Each policy provided coverage for an “occurrence,” which was later defined as an “accident.” Accident was not further defined.
A. MASTERS
Masters involved an intentionally set fire that had the unintended result of destroying nearly a block of business establishments. As in this case, the policy in Masters provided coverage for an “occurrence,” which was later defined in the policy as “an accident.” 460 Mich 113. The insureds claimed that the event was an accident because, although the fire in their business premises was deliberately set, they did not intend to damage the adjoining buildings.
The Court of Appeals applied a subjective standard in assessing whether the insured arsonists expected or intended to bum properties other than their own. This Court reversed. We first gave “accident” its customary, ordinary meaning as an “undesigned contingency, a casualty, a happening by chance, something not anticipated, . . . and not naturally to be expected.” Id. at 114. Having defined accident, we nevertheless recognized the difficulty of categorizing cases in which the action giving rise to the harm was intended *295 even though the consequences were not. We unanimously held that an insured’s intentional actions precluded coverage even though the insureds claimed not to have intended the consequences of their actions where the insured “reasonably should have expected” the harm the insured’s acts created. We adopted this objective standard from Justice Griffin’s concurrence in Auto Club Group Ins Co v Marzonie, 447 Mich 624, 648-649; 527 NW2d 760 (1994):
In such cases, a determination must be made whether the consequences of the insured’s intentional act either were intended by the insured or reasonably should have been expected because of the direct risk of harm intentionally created by the insured’s actions. When an insured acts intending to cause property damage or personal injury, liability coverage should be denied, irrespective of whether the resulting injury is different from the injury intended. Similarly, . . . when an insured’s intentional actions create a direct risk of harm, there can be no liability coverage for any resulting damage or injury, despite the lack of an actual intent to damage or injure. [Masters, 460 Mich at 115-116 (Emphasis added.)]
Granting summary disposition to the insurer, this Court held that, because the Masters intended to cause harm, “ [i]t is irrelevant whether the harm that resulted, damage to the clothing store and surrounding businesses, was different from or exceeded the harm intended, minor damage to the clothing inventory.” Id. at 116-117. We later applied this same objective test in Nabozny.
B. NABOZNY
Similarly, in Nabozny, the plaintiff was injured in a fight with the insured. The policy at issue was identi *296 cal to the one in Masters and this case, and provided coverage for an “occurrence,” which, in turn, was defined as “an accident.” 461 Mich 474. As in the present case, the insured claimed that the injury he caused was a covered occurrence because he did not intend to break the plaintiffs ankle. We unanimously rejected that argument, holding:
In this case, Mr. Burkhardt apparently did not intend to break Mr. Nabozny’s ankle. However, it is plain that in tripping someone to the ground in the course of a fight, Mr. Burkhardt reasonably should have expected the consequences of his acts because of the direct risk of harm created. This precludes a finding of liability coverage under the terms of this policy. In other words, the injury did not result from an “accident.”
Moreover, Mr. Burkhardt’s testimony that he did not intend to “break any bones” does not assist him. In our quote from Marzonie, Justice Griffin cited Piccard, which explained:
“[W]here a direct risk of harm is intentionally created, and property damage or personal injury results, there is no liability coverage even if the specific result was unintended. It is irrelevant that the character of the harm that actually results is different from the character of the harm intended by the insured.”
It is clear from the facts, as stated by the insured, that injury reasonably should have been expected. Therefore, it is irrelevant that the broken ankle was not the specific harm intended by the insured. [Id. at 480-481 (citations omitted).]
It is worth reemphasizing that in both Masters and Nabozny the policy language we construed was identical to the policy language contained in the present case. Here, like Masters and Nabozny, the insured engaged in a deliberate act but claimed that the *297 resulting unintended consequences rendered the event an accident. In both Masters and Nabozny, this Court rejected this argument and held that there was no covered “occurrence” because the insured reasonably should have expected the consequences of his intentional actions—even when the insured himself did not anticipate such consequences. Thus, in Masters and Nabozny we declined to view the expectation of the injury from the subjective perspective of the insureds in making the determination whether an accident occurred.
C. THE MAJORITY’S MISAPPLICATION OF MASTERS AND NABOZNY
The majority erroneously states that the “difference” between the present case and Masters and Nabozny “is that here, while the act was intended, the result was not.” Ante at 290. There is no such “difference” among these three cases. Rather, in both Masters and Nabozny, the insureds made precisely the same claim as presented here—that they did not intend the result of their deliberate acts. Robert intended to pull the trigger of his shotgun, but he testified that he did not intend to cause any physical injury to his friend. The question for the purpose of coverage is whether the shooting can be considered an accident because Robert should not have reasonably expected the consequences when he intentionally aimed his shotgun at the head of his friend, cocked the hammer, and pulled the trigger.
The purported difference between this case and Masters and Nabozny has been created by the majority, which has imposed a different construction of the phrase “intentional act.” As stated in Masters, this *298 Court unanimously adopted an objective test of intentionality: an intentional act causing injury is not an accident if the insured actually intended the harm or if the harm should reasonably have been expected.[5]
Here, the majority fails to apply the objective Masters test of intentionality, instead substituting a subjective one.[6] The majority states that “[w]e agree with plaintiff that Robert intended to point the gun at Kevin and pull the trigger.[7] However, Robert believed that the gun was not loaded. Robert had no intention of firing a loaded weapon. No bodily injury would have been caused by Robert’s intended act of pulling the trigger of an unloaded gun.” Ante at 285 (emphasis added). What the majority must justify, but cannot, is why we must consider his act of pointing a shotgun at another person and pulling the trigger *299 from Robert’s subjective perspective.[8] Under the Masters test, the question is whether the insured “reasonably” should have expected the consequence because of the direct risk of harm he intentionally created. However, the majority tautologically concludes as a matter of law that “Robert should not have reasonably expected the consequences that ensued from his act because his intended act was merely to pull the trigger of an unloaded gun.”[9] Ante at 290 (emphasis added). However, what Robert’s reasonable expectations should have been, not what his actual subjective beliefs may or may not have been, are the focus of the Masters standard.
The majority erroneously maintains that the test we articulated in Masters and Nabozny is a subjective one. However, the majority fails to explain our objective application of the test in both cases. In addition, *300 the term “reasonably” has consistently been construed as indicating an objective rather than a subjective standard. In Allstate Ins Co v Freeman, 432 Mich 656; 443 NW2d 734 (1989), six justices, including the author of the current majority opinion, agreed that “ ‘reasonably be expected’ is unambiguous” and “requires application of an objective standard of expectation.” 432 Mich 688. In Fire Ins Exchange v Diehl, 450 Mich 678, 685; 545 NW2d 602 (1996), the Court held that injury “ ‘neither expected nor intended by the insured’ ” required a subjective standard of expectation where the policy language did “not employ the term ‘reasonably.’ ” (Emphasis added.) The majority simply refuses to acknowledge that the test adopted in Masters and Nabozny utilizes the same language that has been construed by this Court as requiring an objective standard of inquiry.
Without offering any rationale for doing so, the majority makes the insured’s subjective belief regarding the status of the gun definitive, as though no contrary conclusion were possible. The issue is whether, in intentionally creating a direct risk of harm—pulling the trigger of a shotgun without ascertaining if it was loaded—the insured should have reasonably expected the consequences. Given that the applicable standard is objective, the insured’s subjective belief is not controlling.
Inexplicably, under the standard adopted by the majority, neither the holding nor the outcome in Masters or Nabozny could be sustained today.
III. APPLICATION OF MASTERS AND NABOZNY
In the present case, it is uncontested that Robert McCam intentionally aimed the weapon at the victim, *301 engaged the hammer, and pulled the trigger.[10] Because he denied intending the actual injury, the event is an “occurrence” only if he should not have reasonably expected the consequences in light of the direct risk of harm intentionally created.
The scope of the direct risk of harm created by an insured’s act is necessarily dependent upon the nature of the intentional act and the facts and circumstances surrounding the event. The direct risk of harm created by intentionally throwing knives, for example, is far greater than the direct risk of harm created by intentionally throwing cotton balls. In each instance, the natural result of the voluntary act must be considered. See 9 Couch, Insurance, 3d, § 126:27, p 126-53.
What is the direct risk of harm consonant with pulling the trigger of a firearm? The obvious risk is that the weapon, if loaded, might discharge and cause an injury. In my view, the evidence adduced at the summary disposition stage warrants the conclusion that the insured should have reasonably expected the consequences of his intentional act.
In his deposition testimony, McCarn testified that he consumed marijuana before taking the weapon out of storage. He also testified that he believed that the gun was unloaded and that he was “just playing” when he pulled the trigger of the weapon. However, he later admitted that he intended to frighten LaBelle into parting with crackers.[11]
*302 In addition, McCarn admitted that he did not check the status of the gun before pulling the trigger. He also testified that the last time he used the gun, he put it away hurriedly and could not recall whether he unloaded the weapon before putting it away. Further, the insured admitted that he deliberately aimed the weapon one foot away from the victim’s face, engaged the hammer, and pulled the trigger in an effort to assault the victim.[12]
As we noted in Nabozny, “it can be in the interest of an insured defendant to provide testimony that will allow an injured plaintiff to recover from the insurer rather than directly from the defendant.” Id., at 479, n 10. As stated, I do not believe that reasonable jurors could conclude that Robert’s stated beliefs about the harm he was creating were reasonable. Inasmuch as the reasonableness of Robert’s expectations about the harm he created is the critical issue for the purpose of coverage under this policy, summary disposition in favor of plaintiff is appropriate. Therefore, I believe that the majority errs in holding that the event was an accident as a matter of law.
CONCLUSION
Because I believe that Robert reasonably should have expected the consequences of his actions in *303 light of the direct risk of harm he created, I would affirm summary disposition in favor of plaintiff.[13]
Corrigan, C.J., and Weaver, J., concurred with Young, J.

 Frankenmuth Mut Ins Co v Masters, 460 Mich 105; 595 NW2d 832 (1999).

 Nabozny v Burkhardt, 461 Mich 471; 606 NW2d 639 (2000).

 Before retrieving the shotgun, McCam testified that he and LaBelle got something to eat after school, went to a friend’s house for ten minutes, smoked “[o]ne joint and a bowl” of marijuana, watched videos, and played with a guinea pig and a hedgehog.

 While earlier in his testimony, McCarn denied pointing the gun at LaBelle with the intention of frightening him, stating that he was “just playing,” he also admitted that he thought the anticipated clicking sound “would" be frightening” to LaBelle. Later on in his testimony, McCam admitted that he was “attempting to frighten” LaBelle “into giving [him] the crackers.”

 To reiterate, the Masters standard is as follows: “[A] determination must be made whether the consequences of the insured’s intentional act ‘either were intended by the insured or reasonably should have been expected because of the direct risk of harm intentionally created by the insured’s actions.’ ” The majority attempts to avoid applying an objective standard, urging that, in the Masters standard, “by the insured” modifies both “intended” and “expected.” This is grammatically incorrect. In fact, grammatically speaking, the phrases “intended by the insured” and “reasonably should have expected” modify “consequences.” Therefore, the Masters standard unqualifiedly and grammatically requires an inquiry into the reasonableness of the insured’s expectations concerning the consequences of his intentional acts. This is an objective inquiry, not, as the majority contends, a subjective one.
It appears to me that this Court wisely chose to use an objective definition of accident in Masters because it creates a disincentive for collusion between an insured and a plaintiff. See Nabozny, supra at 479, n 10.

 This Court is free to abandon for sufficient reason its own precedent. When it does so, it should do it openly and provide justification. Here the majority abandons the rule it established in Masters after years of contradictory precedent without acknowledging (1) that it has done so or (2) why it is justified in doing so.

7 I note that the majority would have no factual or legal basis for concluding otherwise, because defendant admitted that he intentionally aimed the gun, engaged the hammer, and pulled the trigger in order to frighten his friend during their dispute over crackers.

 This insistence on viewing Robert’s act from his subjective perspective represents a critical flaw in the majority opinion. The majority declares that it must employ a subjective standard because this, as opposed to an objective standard, aids in construing the policy in favor of coverage. “[W]here there is doubt, the policy should be construed in favor of the insured . . . .” Ante at 283.
This is contrary to the rules of contract interpretation. Contracts, even insurance contracts, are construed according to their unambiguous terms. It is only when there is an ambiguity in the policy language that provides a basis for using a rule of construction favoring coverage. Masters, supra at 111. Because we considered the very contract term at issue here, “accident,” in Masters and Nabozny and found no ambiguity, the majority has no warrant to “construe” that term in any different fashion in this case.

 Yet another flaw in the majority opinion is that it attempts to divide the “intentional act” into components. Rather than view the act from the required perspective—the consequences reasonably expected when a direct risk of harm is created—the majority focuses on whether the insured intended to pull the trigger of an unloaded gun. Without basis, the majority subdivides the intentional act into two components, the voluntary act and the chain of events that the volitional act sets into motion— the consequences. The intentional act committed by Robert was that of pulling the trigger of a gun. That the gun was or was not loaded does not transform the nature of the insured’s volitional act.

 As such, the acts admitted by the insured constitute felonious assault, MCL 750.82.

 The majority would prefer to minimize the insured’s admitted intent to cause harm—to commit a felonious assault. I do not. As we stated in Nabozny, “ ‘where a direct risk of harm is intentionally created, and property damage or personal injury results, there is no liability coverage even if the specific result was unintended. It is irrelevant that the character of *302 the harm that actually results Is different from the character of the harm intended by the insured.’ ” 461 Mich 481, quoting Marzonie.

 The majority attempts to explain why Robert’s later testimony about his prior use of the shotgun is not dispositive. However, I cannot think of a single reason why all the defendant’s admissions should not be considered in deciding whether Robert should have reasonably anticipated the harm he caused in using his weapon.

 As to the issue of how direct a harm the insured’s actions created, this would be a much closer question—and one requiring a trial—if evidence were presented that the insured had checked the gun and mistakenly (or negligently) determined that it was unloaded before pulling the trigger.