*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STATE FARM FIRE & CASUALTY
INSURANCE COMPANY,

Plaintiff-Appellant,

v

NOAH RAVENSCROFT, by Conservator JON
MUNGER, CALVIN MORRISH Individually and
as Personal Representative of the ESTATE OF
KRISTY JO L. RAVENSCROFT, and as
Conservator IAN RAVENSCROFT,
EMMALYNN RAVENSCROFT and ASHLEA
RAVENSCROFT, and SUSAN MORRISH,

Defendants-Appellees.

UNPUBLISHED
September 17, 2019

No. 345377
Oakland Circuit Court
LC No. 2017-160850-CK

Before: BORRELLO, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Plaintiff, State Farm Fire and Casualty Insurance Company (State Farm), appeals as of right an order granting summary disposition of State Farm's amended complaint for declaratory judgment in favor of defendants, Noah Ravenscroft, Calvin Morrish, individually, and Susan Morrish. For the reasons set forth in this opinion, we reverse the trial court and remand to the trial court for entry of summary disposition in favor of plaintiff.

## I. BACKGROUND

On January 23, 2017, Noah Ravenscroft killed his wife, Kristy Jo, by stabbing her 24 times, striking her in the chest 13 times. At the time of the homicide, the couple had three minor children. Prior to the homicide, Noah had been experiencing auditory hallucinations and paranoid beliefs. According to a journal kept by Kristy Jo, and interviews with Noah after the homicide, the television would give Noah messages that would describe what he was to do. On the night of Kristy Jo's death, one of the couple's children overheard Kristy Jo yelling at Noah to get off of her; causing the child to go downstairs and observe Noah holding Kristy Jo down on

-1-

the couch with his hand over Kristy Jo's mouth. Kristy Jo was trying to push Noah off of her. Noah stood up, retrieved a knife from the kitchen, walked back toward Kristy Jo, and stabbed Kristy Jo, killing her. Noah had also stabbed himself in the abdomen.

On January 25, 2017, Noah was released from the hospital and charged with first-degree murder, MCL 750.316. Following two psychological evaluations for criminal responsibility, Noah was found not guilty of first-degree murder by reason of insanity. A wrongful-death action was filed against Noah, which included claims from Kristy Jo's parents, Calvin and Susan. At the time of Kristy Jo's death, Noah and Kristy Jo had a homeowners policy issued through plaintiff. Plaintiff defended Noah in the wrongful-death action under a reservation of rights. However, plaintiff filed an amended complaint for declaratory judgment, seeking a declaration that it was not obligated to defend or indemnify Noah under the terms of the homeowners policy because the bodily injury to Kristy Jo did not constitute an "occurrence," and even if it did constitute an "occurrence," coverage was precluded because the homeowners policy excluded coverage for bodily injury which is expected or intended by the insured.

On June 6, 2018, the trial court entered a stipulated order in which it was agreed by all parties that no coverage existed under the homeowners policy for any claims in the wrongful-death action brought on behalf of the Estate or the minor children. However, it remained disputed whether plaintiff had a duty to provide coverage in regard to the claims brought by Calvin and Susan, individually. The stipulated order stated that, following the exhaustion of all appellate remedies, if it was determined that the alleged bodily injury was caused by an occurrence and the alleged bodily injury was not expected, intended, or the result of Noah's willful or malicious actions, then plaintiff would pay Calvin and Susan the policy limit of $500,000. The parties also agreed that pursuant to the settled record issued on April 17, 2017, in the related first-degree murder case, Noah met the statutory criteria for mental illness and legal insanity and was found not guilty by reason of insanity.

On June 20, 2018, Calvin and Susan, in their individual capacities, filed a motion for summary disposition pursuant to MCR 2.116(C)(10) contending that, on the basis of Noah's psychiatric evaluations and the record in the criminal case, Noah lacked the substantial capacity to appreciate the nature and quality or wrongfulness of his conduct, or to conform his conduct to the requirements of the law; therefore, Noah was incapable of forming the requisite intent to end Kristy Jo's life, making his actions an accidental or negligent occurrence. Similarly, plaintiff filed a motion for summary disposition pursuant to MCR 2.116(C)(10), arguing that there was no genuine issue of material fact that the homeowners policy did not provide coverage for Calvin's and Susan's claims against Noah because (1) the bodily injury to Kristy Jo was not caused by an occurrence, (2) and even if Kristy Jo's death was caused by an occurrence, the homeowner's policy exclusion for bodily injury that is either expected or intended by the insured excluded coverage.

On August 15, 2018, the trial court held oral arguments on the motions for summary disposition, eventually concluding:

Notwithstanding the *Allstate versus Churchman*[1] [sic] case, this is a bench trial and a dec action. In the wide variety of cases addressing the issue the overriding principle appears to be that suicide is not enough to make you truly crazy and thus, unable to form the requisite intent. Nor is the express intent to kill someone. But in cases where the insured was diagnosed as having suffered serious mental illness, audio hallucinations, visual hallucinations, unable to recall one's name, etcetera, the person was unable to form the required intent. Thus, given the record and the case at bar, the insured was indeed unable to form the required intent and therefore, plaintiff's motion is denied and defendant's motion for summary disposition is granted.[2]

Accordingly, on August 20, 2018, the circuit court entered an order denying plaintiff's motion for summary disposition then two days later entered an order granting summary disposition favor of Noah, Calvin, and Susan. This appeal then ensued.

## II. ANALYSIS

On appeal, plaintiff argues that it is relieved from defending and indemnifying Noah for claims brought against Noah by Calvin and Susan in a wrongful-death action because (1) Noah was not entitled to coverage under his homeowners policy because the bodily injury to Kristy Jo was not caused by an "occurrence" and (2) even if the bodily injury to Kristy Jo was caused by an "occurrence," coverage was precluded under the policy because Noah expected or intended the bodily injury he caused Kristy Jo.

"A trial court's decision on a motion for summary disposition in an action for a declaratory judgment is subject to review de novo." *Farm Bureau Ins Co v Abalos*, 277 Mich App 41, 43; 742 NW2d 624 (2007) (citation and quotation marks omitted). A motion for summary disposition under MCR 2.116(C)(10) challenges the "factual adequacy of a complaint on the basis of the entire record, including affidavits, depositions, admissions, or other documentary evidence." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). A trial court's grant of summary disposition under MCR 2.116(C)(10) is proper when the evidence, "viewed in the light most favorable to the nonmoving party, show[s] that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016) "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Gorman*, 302 Mich App at 116 (citation omitted). "[T]he construction and interpretation of contracts are questions of law that we review de novo." *Farmers Ins Exch v Kurzmann*, 257 Mich App 412, 416-417; 668 NW2d 199 (2003).

---

[1] *Auto-Owners v Churchman*, 440 Mich 560; 489 NW2d 431 (1992).

[2] The trial court did not address whether Kristy Jo's death constituted an "occurrence" or whether the exclusion provision for intentional or expected acts as separate matters were applicable.

"An insurance policy must be enforced in accordance with its terms." *Allstate Ins Co v McCarn*, 466 Mich 277, 280; 645 NW2d 20 (2002). "If not defined in the policy, however, we will interpret the terms of the policy in accordance with their 'commonly used meaning.' " *Id.*, quoting *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 112, 114; 595 NW2d 832 (1999). "In interpreting ambiguous terms of an insurance policy, this Court will construe the policy in favor of the insured." *Masters*, 460 Mich at 111. "However, we will not create ambiguity where the terms of the contract are clear." *Id.* "Where there is no ambiguity, we will enforce the terms of the contract as written." *Id.* "A court must first determine if an insurance policy provides coverage, and then it must determine if coverage is excluded." *Home-Owners Ins v Smith*, 314 Mich App 68, 73; 885 NW2d 324 (2016).

We begin our analysis by ascertaining whether the acts of Noah constituted an "occurrence" under the homeowners policy. Under the terms of the homeowners policy, liability coverage exists when there is an "occurrence." The relevant portions of the State Farm homeowners policy provide:

**Coverage L-Personal Liability**

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will:

1. pay up to our limit in liability for the damages for which the insured is legally liable; and

2. provide a defense at our expense by counsel of our choice . . .

The homeowners policy provides the following definition of occurrence:

"[O]ccurrence", . . . means an accident, including exposure to conditions, which results in:

a. bodily injury; or

b. property damage;

during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one occurrence.

The homeowners policy does not define an accident. However, in cases similar to this one, "where the respective policies define an occurrence as an accident, without defining an accident," our Supreme Court has "repeatedly stated that 'an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected.' " *McCarn*, 466 Mich at 281, quoting *Masters*, 460 Mich at 114 (additional quotation marks and citations omitted). " 'Accidents are evaluated from the standpoint of the insured, not the injured party.' " *Smith*, 314 Mich App at 74, quoting *McCarn*, 466 Mich at 282. "[A]n insured need not act unintentionally in order for the act to constitute an 'accident' and therefore an 'occurrence.' " *Masters*, 460

Mich at 115, quoting *Auto Club Group Ins Co v Marzonie*, 447 Mich 624, 648; 527 NW2d 760 (1994) (GRIFFIN, J., concurring), overruled in part on other grounds by *Masters*, 460 Mich at 117 n 8. "[T]he appropriate focus of the term 'accident' must be on both 'the injury-causing *act* or *event* and its relation to the resulting property damage or personal injury.' " *McCarn*, 466 Mich at 282, quoting *Masters* 460 Mich at 115 (additional quotation marks and citation omitted) (emphasis in original).

> . . . [I]f both the act and the consequences were intended by the insured, the act does not constitute an accident. On the other hand, if the act was intended by the insured, but the consequences were not, the act does constitute an accident, unless the intended act created a direct risk of harm from which the consequences should reasonably have been expected by the insured.

> As to the perspective from which the analysis should be made, the question is not whether a *reasonable person* would have expected the consequences, but whether the *insured* reasonably should have expected the consequences. [*McCarn*, 466 Mich at 282-283.]

In *McCarn*, Kevin LaBelle was killed when Robert McCarn shot Kevin with a gun that Robert thought was unloaded. *McCarn*, 466 Mich at 279. Robert had taken the gun from under his grandfather's bed; and he knew that the gun was not normally loaded. *Id*. Robert pointed the gun at Kevin and pulled the trigger, killing Kevin. *Id*. Kevin's estate brought an action against Robert and his grandparents, who had a homeowners policy with Allstate. Allstate brought a declaratory-judgment action, contending that it had no duty to indemnify Robert or his grandparents. *Id*. The trial court granted summary disposition in favor of Robert and his grandparents, as well as Kevin's Estate, holding that the events constituted an "occurrence" within the meaning of the homeowners policy. *Id*. at 279-280. This Court reversed the trial court, concluding that Kevin's "intentional actions created a direct risk of harm that precludes coverage." *Id*. The issue before the Supreme Court was whether an "accident" had occurred; the homeowners policy did not define an accident. *Id*. at 281. The Supreme Court reversed this Court's holding and held:

> Kevin LaBelle's death was an 'accident,' thus an 'occurrence,' covered under the insurance policy. We agree with plaintiff that Robert intended to point the gun at Kevin and pull the trigger. However, Robert believed the gun was not loaded. Robert had no intention of firing a loaded weapon. No bodily injury would have been caused by Robert's intended act of pulling the trigger of an unloaded gun. [*Id*. at 285.]

Justice Michael Cavanaugh, writing for the majority, stated that the ruling was not at odds with prior Court precedents, holding, in relevant part:

The difference between this case and *Nabozny*[3] and *Masters*, however, is that here, while the act was intended, the result was not. Thus, unlike in *Nabozny,* Robert should not have reasonably expected the consequences that ensued from his act because his intended act was merely to pull the trigger of an unloaded gun. Similarly, unlike *Masters,* where the consequence of the act was intended, here the consequence--shot leaving the gun--was not intended. Furthermore, even if one used some variation on a foreseeability test, no bodily harm could have been foreseen from Robert's intended act, because he intended to pull the trigger of an unloaded gun, and, thus, it was not foreseeable, indeed it was impossible, under the facts as Robert believed them to be, that shot would be discharged. Therefore, we cannot say Robert should have expected the unfortunate consequences of his act. The discharge of the shot was an accident and entitled to coverage unless a policy exclusion applies. *Id*.at 290-291.

Here, there is no dispute that Noah had a mental illness at the time he killed Kristy Jo. Defendants argue that Noah's mental illness caused him to lack the substantial capacity to appreciate the nature and quality of the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Essentially, defendants argue that Noah's mental illness caused him to lack the substantial capacity to appreciate the nature or quality of wrongfulness of his actions, thus his inability to conform his actions within the requirements of the law negated his ability to act intentionally. Plaintiff argues that the evidence makes clear that Noah intentionally attacked Kristy Jo. Plaintiff further argues that Noah's conduct in holding Kristy Jo down, retrieving a knife, and stabbing her 24 times while she screamed, revealed his clear intent to kill her. Further, plaintiff argues that Noah's declarations to the police that he had killed Kristy Jo, as well as his comments during his psychological evaluation for criminal responsibility as to his thoughts and actions in stabbing Kristy Jo to death revealed his intent to kill her. Hence, plaintiff contends, even if Kristy Jo's death was an "occurrence," coverage was barred because Noah expected or intended to injure Kristy Jo, and under Michigan law, the fact that Noah was relieved of criminal punishment because of his mental illness did not mean that he could not intend or expect the consequences of his actions.

We are persuaded by the arguments presented by plaintiff and the record. Unlike the facts presented in *McCarn*, here, the record makes clear that the death of Kristy Jo was not the result of an accident, or that the harm inflicted was not intended. Nowhere in this record can we glean any evidence that could lead us to conclude that Noah accidently stabbed his wife twenty-four times, 13 of which were to her chest. Thus, quite unlike *McCarn*, where Robert did not intend to injure the decedent, here, the record makes clear that Noah intended the harm that was inflicted. Focusing on both 'the injury-causing act or event and its relation to the resulting property damage or personal injury[,]' " *McCarn*, 466 Mich at 282, we conclude that the bodily injury to Kristy Jo was not an "occurrence" under the terms of the policy issued by plaintiff and plaintiff was therefore under no legal obligation to defend or indemnify Noah because no

---

[3] *Nabozny v Burkhardt*, 461 Mich 471; 606 NW2d 639 (2000).

coverage existed under the homeowners policy and summary disposition should be entered for plaintiff on that basis.

However, even if we were to conclude that Kristy Jo's death constituted an "occurrence" under State Farm's homeowners policy, the policy excludes coverage for bodily injury "which is either expected or intended by the insured[.]" In deciding whether exclusions are applicable, we are mindful that "[cl]ear and specific exclusions must be enforced as written so that the insurance company is not held liable for a risk it did not assume." *Smith*, 314 Mich App at 73.

In the case relied on by the trial court, *Auto-Owners Ins Co v Churchman*, the insured, Henry Gordon Frost, Jr., became furious and told Mary Churchman that he planned to kill Mary's ex-husband, Gary Churchman. Frost drove to Gary's home; Gary opened the door when Frost knocked, and a few seconds later, Frost shot Gary. *Id*. at 563-564. Gary ran upstairs. *Id*. at 564. Frost followed Gary upstairs and shot him at least three more times, including a shot in the back of Gary's head. *Id*. Frost walked into the garage and killed himself. *Id*. It had been reported that Frost was a paranoid schizophrenic for most of his life. *Id*. Gary's mother and girlfriend brought actions against Frost's estate. At the time of Frost's death, Frost was the named insured on a homeowners policy issued by Auto-Owners Insurance Company (Auto-Owners). *Id*. at 565. Auto-Owners brought a declaratory-judgment action. *Id*. The trial court denied Auto-Owners's motion for summary disposition, concluding that, although Michigan courts did not address the issue, other jurisdictions "found an exclusionary clause in an insurance policy inapplicable if the insured did not have the mental capacity to intend or expect his actions." *Id*. This Court affirmed the trial court's holding. *Id*.

Our Supreme Court "granted leave to consider whether insurance coverage is precluded as a matter of law because of an exclusion for bodily injury coverage when 'expected or intended by an insured person' and the insured is mentally ill or insane." *Id.*at 563. Our Supreme Court ultimately reversed this Court, holding:

> We…conclude that an insane or mentally ill person can intend or expect the results of his actions within the meaning of an insurance policy's exclusionary clause. Further, we do not believe that it is appropriate or necessary to find that someone found not criminally liable by reason of insanity cannot be found to have intended his actions and to have expected their consequences. *Id.* at 569-570.

Our Supreme Court went on to conclude:

> …we hold that it is possible for an insane or mentally ill person to intend or expect the injuries he causes within the meaning of the insurance policy language. This is not to say that the insured is necessarily criminally liable for his acts. We find that an insane or mentally ill individual can still form the requisite intent to injure another and yet may not be considered criminally culpable. *Id*. at 572-573.

In coming to this conclusion, the *Churchman* Court considered and agreed with this Court's holding in *Transamerica Ins Corp of America v Boughton*, 177 Mich App 253, 440 NW2d 922 (1989). In *Boughton*, the insured, Michael Boughton, shot and killed his estranged wife, Joni Boughton. *Id*. at 255. Michael was found not guilty by reason of insanity. *Id*. Joni's

estate brought a wrongful-death action against Michael. *Id*. Michael sought coverage under his homeowners policy issued by Transamerica Insurance Corporation of America (Transamerica) *Id*. However, the homeowners policy excluded coverage for a claim of bodily injury, personal injury, or property damage "which is expected or intended by the insured." *Id*. Transamerica brought a declaratory-judgment action. *Id*. After a bench trial, the trial court ruled that the exclusionary provision in the homeowners policy for intentional and expected acts relieved Transamerica of the duty to defend or provide coverage to Michael. *Id*.

On appeal, this Court affirmed the trial court, stating that "the acts of a person deemed insane may be intentional within the meaning of an 'intentional and expected' acts exclusion." *Id*. at 258-259. Applying that conclusion to the specific facts of that case, this Court concluded that the trial court did not err because the evidence supported a conclusion that Michael intended and expected to cause bodily injury. The *Boughton* Court noted that Michael entered Joni's home with a shotgun and told Joni and her boyfriend that he was going to kill them. *Id*. at 260. Michael also told Joni to put their son to bed because he did not want their son to see what was going to happen; Michael had also told a friend that, if he saw Joni and her boyfriend together, he would have to kill them. *Id*. at 260-261. This Court concluded that, "[g]iven the lower standard of proof in the civil case, there was no contradiction in acquitting Boughton on grounds of insanity at his criminal trial and subsequently finding in the civil action that Joni Boughton's death was intentional and expected." *Id*. However, the *Boughton* Court stated: "We recognize that there will be cases where insanity manifests itself such that the insured cannot intend or expect to cause an injury; an actor may believe, for example, that he is peeling a banana rather than pointing a pistol." *Boughton*, 177 Mich App 253.

Here, the record reveals that in addition to other facts discussed *supra*, prior to killing his wife, Noah had previously gone to the hospital for evaluation after a police officer found Noah standing behind his patrol car at 6:40 a.m. with no shirt or coat on and his pants down to his ankles; Noah was yelling that he was Dan Gilbert and he was going to save the word. Noah was admitted to Stonecrest Center, and while being admitted, he was observed having bizarre behavior and delusion thoughts. Noah was diagnosed with Bipolar Disorder Manic, opiate dependence, and nicotine dependence; subsequent Stonecrest records stated that Noah "is in imminent danger to self—secondary to mental incapacity, not able to take care of self, does not understand treatment needs, severe neuro-vegetative symptoms, no social support," and a danger to himself and others. On December 19, 2016, Noah was discharged from Stonecrest with instructions to take antipsychotic medications. On January 12, 2017, Noah underwent a psychiatric evaluation at Oakland Family Services, and it was documented that Noah had stopped taking the medications prescribed to him at Stonecrest. On January 20, 2017, Noah went to the Oakland County Jail to turn himself, but he was advised that he was not wanted for any crime.

For approximately nine days preceding the homicide, Kristy Jo kept a journal documenting Noah's mental state. Kristy Jo's journal entries reflect that Noah was in a very anxious, panicked, and confused state during the days preceding Kristy Jo's death. He was agitated, confused, and believed everyone was out to get him. On the day of Kristy Jo's death, Noah had barely slept; he had sat in the dark, staring into space. Noah also told Kristy Jo to take the children and leave for the day. When the police arrived at the home after Kristy Jo was killed, Noah told the police that he had killed Kristy Jo and asked the police to shoot him. When a

police officer asked Noah who stabbed him, Noah responded, "they're killing everyone." While being transported to the hospital, Noah stated that he "had signed a contract and was working with the generals to take the election down." Noah told police that he believed the TV was speaking to him.

The evidence establishes that Noah was undoubtedly suffering from a mental illness. However, despite the fact that Noah, for purposes of criminal liability, was incapable of understanding the legal ramifications of his actions, the evidence supports the conclusion that he intended to kill Kristy Jo. Similar to the aggressors in *Churchman* and *Boughton*, while Noah may not have been criminally liable for his acts, he was capable of foreseeing their consequences and understanding what he was doing, i.e., intentionally killing Kristy Jo. As stated in *Boughton*, this is not a situation where Noah mistook the knife for some other object. And, while defendants argue that Noah's inability to conform his actions within the boundaries of the law serve as evidence that his actions were not intended, the ability of Noah to distinguish right from wrong is not implicated. In fact, "[criminal responsibility for those actions is not part of the necessary analysis in cases like [this one]." *Churchman*, 440 Mich at 568. The record makes clear that Noah retrieved a knife and stabbed Kristy Jo 24 times, striking her in the chest 13 times, killing her. When police arrived at the home, Noah told them that he had killed Kristy Jo. From this record we cannot conclude that Kristy Jo's death was the result of an accident. Rather, there is no other conclusion but that Noah intended to take a knife and kill Kristy Jo, despite the fact that Noah was delusional. Accordingly, the exclusionary clause of the homeowners policy applies and there was no coverage.

We therefore reverse the trial court's award of summary disposition to defendants and remand to the trial court for entry of summary disposition in favor of plaintiff.

Reversed and remanded for entry of summary disposition in favor of plaintiff. We do not retain jurisdiction. We do not award costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto